425 F.2d 397
 165 U.S.P.Q. 3
 Samuel D. GOODIS and William Goodis as Executors of the
Estate of David Goodis, Deceased, Plaintiffs-Appellants,
v.
UNITED ARTISTS TELEVISION, INC. and American Broadcasting
Co., Inc., Defendants-Appellees.
 No. 33, Docket 32717.
 United States Court of Appeals, Second Circuit.
 Argued Sept. 19, 1969.
Decided March 9, 1970
 
 Irwin Karp, New York City (Leo Gitlin, New York City, on the brief), for appellants.
 Carleton G. Eldridge, Jr., New York City (Coudert Brothers, and Stephen Sayre Singer, New York City, on the brief), for appellees.
 Weil, Gotshal & Manges, Horace S. Manges and Marshall C. Berger, New York City (on the brief), for American Book Publishers Council, Inc., amici curiae.
 Osmond K. Fraenkel, New York City (on the brief), for Authors League of America, Inc., amicus curiae.
 Before LUMBARD, Chief Judge, and WATERMAN and KAUFMAN, Circuit Judges.
 LUMBARD, Chief Judge:
 
 
 1
 This appeal raises the important question whether a magazine publisher who acquires only the right to serialize a novel before it is published in book form has such an interest in the work that notice of copyright in the publisher's name will protect the copyright of the author of the novel. It also requires us to review the construction of a contract granting motion picture rights which defendants raise as a defense to this infringement action.
 
 
 2
 We all agree that the district court erred in concluding that copyright was not obtained by the publisher and that Goodis' work was thus thrown into the public domain without copyright protection. Moreover, since a majority of the panel, Judges Waterman and Kaufman, are of the view that interpretation of the contract involves factual determinations which should not have been made on a motion for summary judgment, we reverse the judgment of the district court and remand for further proceedings on those questions.
 
 
 3
 The plaintiffs are the executors of David Goodis, author of the novel 'Dark Passage,' a work which has proved both popular and adaptable to presentation in many of the entertainment media. When Goodis completed the novel in 1945, he made arrangements for the book to be printed in April, 1946. Later, on December 20, 1945, Goodis sold the exclusive motion picture rights in the novel to Warner Brothers for $25,000. The contract was Warner Brothers' standard form for acquiring movie rights, but, as we state below, it contained additional specially negotiated clauses to cover radio and television broadcast rights.
 
 
 4
 Before the book was published, Goodis also received $12,000 from Curtis Publishing Co. for the right to serialize the novel in 'The Saturday Evening Post,' one of Curtis' publications. The book publisher agreed to postpone distribution of the book until October, 1946, and 'Dark Passage' was first published in eight installments of 'The Saturday Evening Post' running from July 20 to September 7, 1946. Each issue contained a single copyright notice in the magazine's name as provided by the Copyright Act.[1] There was no notice in Goodis' own name.
 
 
 5
 In due course, Warner Brothers produced a motion picture, also titled 'Dark Passage,' based on the novel. After the film was exhibited in theaters and shown on television, Warner Brothers in 1956 assigned its contract rights to defendant United Artists. United Artists produced a television film series, 'The Fugitive,' which was broadcast in weekly installments by defendant American Broadcasting Co. The series enjoyed considerable popularity on television, and early in 1965 Goodis instituted this action claiming $500,000 damages for copyright infringement. The defendants answered that the television series was covered by the contract which had been assigned to them by Warner Brothers.
 
 
 6
 In 1966, the defendants took Goodis' deposition and learned of his serialization agreement with Curtis. At this point, they conceived the theory that the work had fallen into the public domain because Curtis, a 'mere licensee,' had taken out copyright in its own name only. By stipulation the defendants amended their answer to include this affirmative defense.
 
 
 7
 The district court granted defendants' motion for summary judgment and dismissed the complaint on the grounds (1) that 'Dark Passage' had fallen into the public domain, and (2) that the contract between Goodis and Warner Brothers clearly conveyed the right to produce a film series like 'The Fugitive.'
 
 I. THE COPYRIGHT
 
 8
 We unanimously conclude that where a magazine has purchased the right of first publication under circumstances which show that the author has no intention to donate his work to the public, copyright notice in the magazine's name is sufficient to obtain a valid copyright on behalf of the beneficial owner, the author or proprietor.
 
 
 9
 In the district court, defendants argued that the single copyright notice in the magazine's name was not sufficient to preserve Goodis' rights in 'Dark Passage'; thus, the novel, not being protected upon first publication, was thrown into the public domain as it appeared, installment by installment, in the 'Saturday Evening Post.' While it is clear that a periodical under some circumstances may obtain copyright for itself on the contents of an issue by a single copyright notice containing its own name, 17 U.S.C. 3; Kaplan v. Fox Film Corp., 19 F.Supp. 780 (S.D.N.Y.1937), defendants urged that Curtis could only obtain copyright on behalf of the beneficial owner for those installments of which it was a 'proprietor' or 'assignee,' rather than a mere 'licensee.' 17 U.S.C. 3, 9; Morse v. Fields, 127 F.Supp. 63 (S.D.N.Y.1954). Relying on Morse v. Fields and cases with similar language, the district court concluded as a matter of law that Curtis could not have been an assignee because it had been granted only a license for a one-time serialization of the novel.
 
 
 10
 Such a determination rests on the doctrine of 'indivisibility of copyright,' which rejects partial assignments of copyrights and requires a proprietor or assignee of a copyright to hold nothing less than all the rights in a copyrighted work. It is true that Curtis did not own all the rights in 'Dark Passage' at the time it was first published; in fact, at that time Goodis and Warner Brothers had already contracted for the exclusive motion picture rights.
 
 
 11
 We are convinced, however, that the doctrine of indivisibility of copyright is a judge-made rule which relates primarily to the requisite interest needed to bring an infringement action. See generally, H. Warner, Radio and Television Rights 53 (1953). The most frequently cited policy for applying the indivisibility rule is to avoid multiple infringement actions, each brought by the holder of a particular right in a literary work without joining as co-plaintiff the author or proprietor of the copyrighted work. New Fiction Pub. Co. v. Star Co., 220 F. 994 (S.D.N.Y.1915). Even after the Copyright Act underwent substantial revision and liberalization in 1909, the courts in this circuit indicated support for the doctrine. See Goldwyn Pictures Corp. v. Howell Sales Co., 282 F. 9 (2d Cir. 1922); New Fiction Pub. Co. v. Star Co., supra; but cf. Photo-Drama Motion Picture Co., Inc. v. Social Uplift Film Corp., 213 F. 374 (S.D.N.Y.1914), aff'd, 220 F. 448 (2d Cir. 1915). The doctrine was seriously questioned in subsequent years, Houghton Mifflin Co. v. Stackpole Sons, Inc., 104 F.2d 306, 311-312 (2d Cir. 1939), but has not been overruled.
 
 
 12
 But, regardless of the vitality of the indivisibility theory as it applies to the question of standing to sue, we do not think that it is determinative as to the requisite interest of a party who may act to obtain copyright. In the cases relied upon by the district court, it was found either that a complete assignment had been made, Mail & Express Co. v. Life Pub. Co.,192 F. 899 (2d Cir. 1912); Morse v. Fields, supra, or that the plaintiff claiming infringement was not the author or proprietor of the work, Egner v. E.C. Schirmer Music Co., 139 F.2d 398 (1st Cir.), cert. denied, 322 U.S. 730, 64 S.Ct. 947, 88 L.Ed. 1565 (1943); Kaplan v. Fox Film Corp., supra. We find nothing in the established cases which requires us to extend the logic of those precedents to a case where an author is plaintiff. We are loath to bring about the unnecessarily harsh result of thrusting the author's product into the public domain when, as here, everyone interested in 'Dark Passage' could see Curtis' copyright notice and could not have believed there was any intention by Goodis to surrender the fruits of his labor.
 
 
 13
 Courts have been understandably reluctant to invoke the doctrine of indivisibility where the author or proprietor of the work is the plaintiff and the result would be to deprive the plaintiff of the fruits of his creative effort. In Bisel v. Ladner, 1 F.2d 436 (3rd Cir. 1924), a publisher who had taken out copyright in his own name was deemed to hold legal title to the copyright for the 'beneficial owner,' the author-plaintiff, although it was clear the publisher had not acquired all rights in the work. See also, Maurel v. Smith, 271 F. 211 (2d Cir. 1921); Harms & Francis, Day & Hunter v. Stern, 229 F. 42 (2d Cir. 1916); Quinn Brown Pub. Co. v. Chilton Co., 15 F.Supp. 213 (S.D.N.Y.1936); Harper & Bros. v. M. A. Donohue & Co., 144 F. 491 (N.D.Ill.1905).
 
 
 14
 The holdings in New Fiction Pub. Co. v. Star Co., supra, and Goldwyn Pictures Corp. v. Howell Sales Co., supra, do not present any barrier to our conclusions. In New Fiction, an author named Goodman had obtained copyright on his work and had sold serial rights to the plaintiff company, which sued when the defendant infringed the serial rights. The district court found Goodman had not divested himself of all interest in the work and, following the indivisibility theory, it dismissed plaintiff's action. Judge Mayer, after discussing the policy supporting the doctrine, concluded his opinion by noting: 'It will be understood that I am not passing on the question which would be presented if Goodman were a party plaintiff.' Supra, 220 F. at 997. A similar question was resolved against the plaintiff in Goldwyn, the court specially pointing out that 'we express no opinion in respect of what the legal status of plaintiff would be if Mrs. Gunther (the authoress-proprietor) were joined as party plaintiff.' Supra, 282 F. at 12. Likewise in the instant case, although we hold Curtis had sufficient interest to obtain copyright in behalf of Goodis, we express no opinion on whether a publisher in Curtis' position could maintain an infringement action without joining the author.
 
 
 15
 We believe a distinction between applying the indivisibility doctrine to cases where the issue is standing to sue for infringement and cases where the issue is protection of the author's interest is supported by the Copyright Act and by common sense. Under the Copyright Act of 1831,[2] an author or proprietor obtained copyright, before publication, by depositing a copy of the title of his work in the district court in the district of his domicile. Thus, had Goodis completed his novel before 1909 and made the required deposit, he would have obtained copyright in his own name before publication and would have been free to market his work to his best advantage, selling serial rights, dramatic rights, etc. at his pleasure, without jeopardizing his copyright. In several cases before 1909 harsh forfeitures resulted from technical failures to comply with the statute, even though there was little chance that the public might have been misled by the errors. Mifflin v. R.H. White Co., 190 U.S. 265, 23 S.Ct. 771, 47 L.Ed. 1043 (1903); Mifflin v. Dutton, 190 U.S. 260, 23 S.Ct. 769, 47 L.Ed. 1040 (1903).
 
 
 16
 In 1909 the Copyright Act was amended and the method of obtaining copyright simplified. Under the revised Act, an author or proprietor could secure statutory protection by actual publication of the work with notice in conformity with the Act.[3] Although appellees characterize this change as irrelevant, we think it is critical. Suddenly the author who might previously have obtained copyright before publication had to guard against any legal infirmity surrounding first publication which might throw his work into the public domain.[4] One can understand the requirement that only an author or proprietor perfect copyright under the 1831 statute, since copyright had to be obtained before publication and the author or proprietor was expected to have exclusive control over the work. After 1909, however, it was to be expected that first publication of the work, whether in magazine or book form, would be the means of obtaining copyright. To require full proprietorship by the initial publisher would too often provide a trap for the unwary author who had assumed the publisher would attend to copyrighting the work in his behalf.
 
 
 17
 In considering the 1909 amendments and the liberalizing spirit in which they were enacted, we note that the proposed general revision of the copyright law, introduced in the 90th Congress and referred to the House and Senate Judiciary Committees,[5] would make the result reached by the district court in the present case impossible. S. 597, 90th Cong., 1st Sess. 201(c), 403(a), 403(b), 405(a) (1967). In summary, these proposed provisions[6] make it clear that: (1) the author of a literary work which is published for the first time in a 'collective work' such as a periodical holds a copyright distinct from that in the collective work as a whole, 201(c); (2) that first publication in a collective work under a general copyright notice in the name of the periodical publisher is sufficient to secure the author's copyright in the work, 403(a); and (3), that where the person named in the copyright notice applicable to a collective work is not the owner of the copyright in a separate contribution which appears in the collective work without its own notice, the case is treated simply as one with an error in the name in the notice, such error not affecting the validity or ownership of the copyright. 403(b), 405(a).[7]
 
 
 18
 The report of the House Committee on the Judiciary states that these proposed provisions deal 'with a troublesome problem under the present law: the notice requirements applicable to contributions published in periodicals and other collective works.' H.R.Rep.No.83, 90th Cong., 1st Sess. 113 (1967). Our decision today is that the result which the proposed legislation would compel is not precluded in any way by the decisions rendered under the present Copyright Act. As discussed earlier, the 'problem' with which the proposed legislation deals is one which exists because of judicial dicta rendered in cases not apposite to the factual situation before us in this case. We believe that it is time to settle the disquieting implications of these dicta in cases where the author sues for infringement.
 
 
 19
 In reaching this result, we also take account of modern business practices. Today many magazines market new writings in serial form. It should be expected that serialization will often be the 'first publication' of a work, since much of the value of such an arrangement to the periodical lies in reaching magazine readers before the complete book has been released.
 
 
 20
 The harsh results before the 1909 amendments should be avoided if possible, particularly as here where the magazine's own notice of copyright is more than adequate to apprise any innocent party that he might be infringing another's copyright. As both amicus curiae briefs point out, the principal purpose of the statutory notice provisions is to inform the public that copyright is claimed.[8] Appellees do not dispute that the Curtis notice was perfectly adequate for this purpose. Although placing a special notice in the author's own name on each installment appearing in the magazine would be a more careful practice than we find here, we do not think that failure to do so, by itself, should cause an author to suffer forfeiture.
 
 
 21
 That such an arrangement between Curtis and Goodis is in the nature of a 'partial assignment' is no reason to require a different result. This circuit 30 years ago understood the desirability of recognizing partial assignments. Houghton Mifflin Co. v. Stackpole Sons, Inc., supra. Where the question is the interest needed to obtain copyright, we reiterate that the important considerations are the intention of the parties to obtain copyright and the adequacy of notice to the public; the characterization of the publisher as assignee or licensee is secondary.
 
 THE CONTRACT
 
 22
 Having concluded that the copyright was validly obtained in behalf of Goodis and that he may maintain an action for infringement, I turn to the contract for motion picture rights on which defendants rely. The views of the majority on this issue are set forth in Judge Waterman's opinion. My own view is that the district court properly decided this question on a motion for summary judgment.
 
 
 23
 The relevant provisions of the contract are carefully set forth and discussed in the district judge's memorandum opinion, 278 F.Supp. 122 (S.D.N.Y.1968). The critical clause in paragraph 19(c) of the contract conveys '* * * the right to broadcast and transmit any photoplay produced hereunder by the process of television * * *.' Although my brothers discuss 'springboards' and 'sequels,' the only question which the district court had to decide was whether this particular television series could be produced under this particular contract.
 
 
 24
 This is not a case where the question is the right to broadcast a movie on television, cf. Bartsch v. Metro-Goldwyn-Mayer, Inc., 270 F.Supp. 896 (S.D.N.Y.1967), aff'd, 391 F.2d 150 (2d Cir.), cert. denied, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968). The contract clearly provided for the presentation of the movie 'Dark Passage' on television and appellant concedes the propriety of such broadcasts. Appellant claims, however, that 'any photoplay produced hereunder' does not encompass 'The Fugitive,' a film series produced directly for television without any intention to show it in motion picture theaters. I think a fair interpretation of the contract indicates that the grant of motion picture rights was sufficiently broad to include this use.
 
 
 25
 Under paragraph 17, defendants purchased the 'absolute and unlimited right * * * to make such changes, variations, modifications, alterations, adaptations, arrangements, additions in and/or eliminations and omissions from said Writings and/or the characters, plot, dialogue, scenes, incidents, situations, action, language and theme thereof * * *.' Under paragraph 19(c), Goodis retained 'the right to broadcast said Writings by television from the performances given by living actors.'
 
 
 26
 Had Goodis sold specific, limited rights in 1945 and retained for his future use or disposition the general reservoir of broadcast rights, I might be persuaded that a question of fact existed. But Goodis retained only the specific right to 'broadcast said Writings by television from performances by living actors,' and I find it difficult to imagine a broader transfer of rights than that which these parties drafted. It seems clear to me the district judge properly decided on summary judgment that defendants could produce and televise films in any manner they might choose other than from the performances of live actors.
 
 
 27
 The majority claims that my construction may affect the interpretation of many similar contracts which do not explicitly mention the right to make 'sequels' using the original characters. I do not share this concern.
 
 
 28
 First, unlike most of the contract, which was Warner Brothers' standard form, the paragraph describing television broadcast rights was specially drafted by the parties. It is unlikely any other contracts drafted circa 1945 will be affected by our determination of these parties' intentions as expressed in these specially negotiated terms.
 
 
 29
 Second, although the majority shows great concern for the use of 'sequels,' the question of sequels was not, in my opinion, before the district court. In paragraph 16 of the complaint, Goodis took particular care to show an exact parallel between 'Dark Passage' and 'The Fugitive.' The content of 'The Fugitive' was not raised by Goodis as a factual issue in his opposition to the summary judgment motion. For all that appears in the record, the 'sequel' argument was raised for the first time on appeal in an effort to overturn the grant of summary judgment.
 
 
 30
 The majority implies in a footnote that this view reflects a return to 'dangerously technical methods of pleading.' Apparently they are assuming that a litigant in Goodis' position would have to walk a narrow line between pleading sufficient identity for infringement on the one hand and sufficient difference for a 'sequel' claim on the other. Whether or not this might be a real problem in the ordinary infringement action, it is certainly not crucial in a case where a defendant has a contractual right to use a work and the only question is whether he has exceeded his rights.
 
 
 31
 Although I agree that there was no forfeiture of 'Dark Passage' into the public domain because of the procedure used to secure copyright, I would affirm the grant of summary judgment by the district court as the contractual rights of the parties were clearly defined.
 
 
 32
 Reversed and remanded.
 
 
 33
 WATERMAN, Circuit Judge, with whom IRVING R. KAUFMAN, Circuit Judge, joins (concurring partially with Chief Judge LUMBARD):
 
 
 34
 My brother Kaufman and I concur in that part of Chief Judge Lumbard's opinion which holds that Goodis did not surrender his copyright in Dark Passage because of the Saturday Evening Post publication. We do not agree with his view that the defendant below is entitled to summary judgment on the issue of whether the contract between Goodis and Warner Brothers conveyed the right to make and broadcast a television series such as The Fugitive. Accordingly, on this branch of the case our holding is that of the majority.
 
 
 35
 The party to whom summary judgment is awarded must have shown 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed.R.Civ.P. 56(c). The question presented here is whether the contract language demonstrates unambiguously that Goodis meant to convey to Warner Brothers the right to create a television series such as The Fugitive or whether a genuine issue of material fact exists as to what the parties intended by the language they used.
 
 
 36
 The rights which the contract conveyed to Warner Brothers 'in said writings' included 'the exclusive, complete and entire motion picture rights,' and 'the right to broadcast and transmit any photoplay produced hereunder by the process of television * * * provided that such broadcasts and transmissions are given from the film of such photoplay and not directly from the performances of living actors.' The judge below held that the term 'any photoplay produced hereunder' unambiguously included a television series of photoplays such as The Fugitive. Accordingly, he awarded summary judgment to the defendants.
 
 
 37
 We disagree. It is our holding that the contract language does not so clearly permit production of The Fugitive as to entitle the defendant to the grant of a summary judgment.
 
 
 38
 The language of the contract clearly conveys to Warner Brothers the right to make a movie of Dark Passage and to show that movie on television. Moreover, Paragraph 17 of the contract conveys the right to vary the plot and characters of Dark Passage in making that movie. The question before us, however, is whether the contract unambiguously fails to put any limits on the degree to which Warner Brothers could change or modify the original story while using the story's characters.
 
 
 39
 In an appeal from summary judgment we must resolve all disputed questions of fact in favor of the appellant. Therefore, we accept appellant's factual representations in the complaint and assume that The Fugitive television series took the characters in Dark Passage and, using the novel's plot as a springboard, placed the characters the author created in a whole series of new plot situations developed by the motion picture company. It seems to us that the right to make 'additions in * * * said writings' and in the characters and plot of Dark Passage does not necessarily go so far as to show that there is no genuine issue as to whether the characters of Dark Passage may be depicted in photoplay adventures which bear little relationship to the 'said writings' of Dark Passage. Viewed in the context of the entire contract, the 'additions' and 'alterations' clauses of Paragraph 17 could be read in a more restrictive manner to permit only those alterations necessary to adapt a written story to the medium of film. Similarly, use of the word 'unlimited' with respect to the rights to alter and supplement could have been intended only to prevent Goodis from protesting that his story had been distorted or mutilated.
 
 
 40
 Among the reasons that have caused us to conclude that this case should not be decided without a full inquiry into the intent of the parties is that our disposition of this appeal may affect the interpretation of other contracts which convey some of the divisible rights in a given story but do not explicitly mention among the conveyed rights the right to make subsequent stories employing the same characters, i.e., 'sequels' as such stories are called in the publishing industry. Too, a proper decision as to what the parties intended in this case may largely depend upon the general custom and expectations of authors and of members of the publishing, broadcasting, and film vocations. Because this case reaches us after a grant of summary judgment we have before us no evidence as to these customs and expectations. Many authors have used characters they created in one novel in a whole series of subsequent works; surely it would be rash of us to hold on summary judgment that the sale of rights in one of an author's works ends, without specific mention that it ends, the author's exclusive ownership of the valuable characters he created in that one work, when he may well desire to create sequels of his own using these same characters. Accord, Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, 216 F.2d 945 (9 Cir. 1954), cert. denied, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756 (1955).[1]
 
 
 41
 We further note, contrary to our brother Lumbard's view, that the issue of the right of defendants to use the characters from Dark Passage in new plot situations was properly raised by appellant before the district court. The court below was not misled into thinking that The Fugitive contained no plot material beyond that of Dark Passage. Judge Mansfield noted in his opinion that the plaintiff asserted that the contract limited Warner Brothers' rights to a photoplay made from the original story, so it is obvious that the judge understood plaintiff's contention that The Fugitive was not identical to Dark Passage although it built upon that story's theme and used the author's characters.[2] Moreover, common sense indicates that the material used in a television series which was broadcast for one hour a week for more than one season could not possibly be confined to the limited material found in a single movie or in a short novel. The arguments made to this court were therefore properly raised below. Once plaintiff's assertion was understood below, namely that Goodis had retained certain rights in the characters of Dark Passage, and that The Fugitive used these characters, it is certainly not crucial whether the complaint used the term of art 'sequel' in referring to the television series.
 
 
 42
 Reversed and remanded for further proceedings below.
 
 
 43
 IRVING R. KAUFMAN, Circuit Judge (concurring with WATERMAN, Circuit Judge, and concurring partially with LUMBARD, Chief Judge):
 
 
 44
 I concur fully in the opinion of my brother Waterman and in that portion of my brother Lumbard's opinion which holds that publication in the Saturday Evening Post did not place Dark Passage in the public domain.
 
 
 
 [1]
 17 U.S.C. 3
 
 
 [2]
 Section 1 of the 1831 Act provides: 'the author or authors of any book * * * not printed and published, * * * shall have the sole right and liberty of printing * * *.' Section 4 provides: 'no person shall be entitled to the benefit of this act, unless he shall, before publication, deposit a printed copy of the title of such book * * * in the clerk's office of the District Court of the district wherein the author or proprietor shall reside.'
 
 
 [3]
 Section 10 of the 1909 Act provides: 'Any person entitled thereto * * * may secure copyright for his work by publication thereof with the notice of copyright required by this title * * *.'
 
 
 [4]
 Section 2 of the Copyright Act of 1909 expressly recognizes the author's common law copyright in an unpublished work. Furthermore, under section 12 of the Act, authors of certain types of work, of which copies are not reproduced for sale, may obtain a pre-publication statutory copyright by depositing a copy of a work or a part of the work with claim of copyright. However, an author will lose his section 2 or section 12 copyright in a work if he publishes it without complying with the notice provisions of section 10
 
 
 [5]
 The proposed legislation to which we refer is thorough and complete. It is the product of a great deal of work by the Register of Copyrights, his staff, a panel of consultants drawn from the copyright bar, 22 days of hearings in 1965 (at which over 150 witnesses testified), and numerous executive sessions of a subcommittee of the House Committee on the Judiciary H.R.Rep.No.863, 90th Cong., 1st Sess., at 2-3 (1967). The House Report just cited contains excellent descriptions of the proposed provisions coupled with accurate summaries of the existing law in areas where the new statute would work a change. (See e.g., H.R.Rep.No. 83, supra, at 96-100, discussing the federal preemption section of the proposed act.) As such, the Report constitutes a valuable reference tool to be used in cases arising under the present Copyright Act
 
 
 [6]
 As under the present Act, copyright is secured by publication with notice. 401(a) Proposed Act
 Section 201(c) provides:
 (c) Contributions to Collective Works.-- Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series. Section 403(a) provides:
 (a) A separate contribution to a collective work may bear its own notice of copyright, as provided by sections 401 and 402. However, a single notice applicable to the collective work as a whole is sufficient to satisfy the requirements of sections 401 and 402 with respect to the separate contributions it contains (not including advertisements inserted on behalf of persons other than the owner of copyright in the collective work), regardless of the ownership of copyright in the contributions and whether or not they have been previously published. Section 403(b) provides:
 (b) Where the person named in a single notice applicable to a collective work as a whole is not the owner of copyright in a separate contribution that does not bear its own notice, the case is governed by the provisions of section 405(a).
 Section 405(a) provides:
 (a) Error in Name.-- Where the person named in the copyright notice on copies or phonorecords publicly distributed by authority of the copyright owner is not the owner of copyright, the validity and ownership of the copyright are not affected. In such a case, however, any person who innocently begins an undertaking that infringes the copyright has a complete defense to any action for such infringement if he proves that he was misled by the notice and began the undertaking in good faith under a purported transfer or license from the person named therein, unless before the undertaking was begun:
 (1) registration for the work had been made in the name of the owner of copyright; or
 (2) a document executed by the person named in the notice and showing the ownership of the copyright had been recorded. The person named in the notice is liable to account to the copyright owner for all receipts from purported transfers or licenses made by him under the copyright.
 
 
 [7]
 Section 405(a) does give a limited defense to one who infringes in a case where there is an error in the name in the notice 'if he proves that he was misled by the notice and began the (infringing) undertaking in good faith under a purported transfer or license from the person named (in the erroneous notice) * * *.' See note 6, supra. As we note infra, the present case does not present such a problem, and we express no opinion on such a case
 
 
 [8]
 To avoid accidental forfeiture, courts have liberally construed what constitutes adequate notice. See, e.g., Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487 (2d Cir. 1960); National Comics Publications Inc. v. Fawcett Publications, Inc., 191 F.2d 594 (2d Cir. 1951)
 
 
 [1]
 In that case the original owners of the copyright to The Maltese Falcon had sold Warner Brothers the right to use that story in moving pictures, radio, and television. When the original owners subsequently used the characters developed in The Maltese Falcon in a new radio series, The Adventures of Sam Spade, Warner Brothers contended that the contract gave it the exclusive right to the use of the characters as well as the exclusive right to the use of the original story in the specified media. The court, however, held that the assignment of copyright in the Falcon did not convey rights to the characters so that the rights in the characters remained in the author, citing Nichols v. Universal Pictures Corp., 45 F.2d 119 (2 Cir. 1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), and Warner Bros. Pictures, Inc. v. Majestic Pictures Corp., 70 F.2d 310 (2 Cir. 1934). Although the Ninth Circuit did not reach the question whether Warner Brothers could have used the characters of the Falcon in a new series even without an exclusive copyright-- by asserting, in effect, that now the Falcon's characters were in the public domain-- we think such a conclusion would be clearly untenable from the standpoint of public policy, for it would effectively permit the unrestrained pilfering of characters
 
 
 [2]
 Paragraph 16 of the complaint alleges that 'defendant * * * had no rights in and to the broadcast of said writings or any part thereof by television except use of the original motion picture' which Warner Brothers had previously made from the novel, and Paragraph 17 alleges that United Artists, Warner Brothers' successor in interest, made a television series entitled The Fugitive in breach of the contract. Paragraph 18 et seq. go on to allege and describe similarities between The Fugitive and Dark Passage in order to establish infringement. Judge Lumbard appears to assert that Goodis, in order thus to establish infringement, alleged such a substantial identity between The Fugitive series and Dark Passage that he concluded The Fugitive series to be a photoplay made from Dark Passage within the meaning of the contract. We disagree, for to trap a plaintiff in such a well-concealed pitfall would mark a return to dangerously technical methods of pleading