Raymond ROHAUER and Cecil W. Hull, Plaintiffs-Appellees,

v.

KILLIAM SHOWS, INC., et al., Defendants,

Killiam Shows, Inc., and Educational Broadcasting Corporation, Defendants-Appellants.

No. 129, Docket 76–7177.

United States Court of Appeals, Second Circuit.

Argued Nov. 18, 1976.

Decided Jan. 7, 1977.

Certiorari Denied May 31, 1977. See 97 S.Ct. 2666.

Peter A. Jaszi, and Jeffrey L. Squires, Washington, D.C. (Abraham Fuss, and Laitman, Mathews & Magidson, New York City, of counsel), for defendants-appellants.

Herbert P. Jacoby, New York City (Burns & Jacoby, New York City, of counsel), for plaintiffs-appellees.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City (Gerald Meyer, Alan A. Benjamin, and Thomas G. Jackson, New York City, of counsel), for United Artists Corp., amicus curiae.

Irwin Karp, New York City, for The Authors League of America, Inc., amicus curiae.

Before WATERMAN, FRIENDLY and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

This well briefed and argued appeal raises a question of copyright law of first impression.[1] The question is of considerable importance despite the small amount of money here at stake. The issue is this: When the author of a copyrighted story has assigned the motion picture rights and consented to the assignee's securing a copyright on motion picture versions, with the terms of the assignment demonstrating an intention that the rights of the purchaser shall extend through a renewal of the copyright on the story, does a purchaser which has made a film and obtained a derivative

---

1. Appellants loudly assert this to be so. Appellees concede we have a case of first impression but only "in the strictest possible sense." For reasons later developed, we think it is a case of first impression *simpliciter*.

copyright and renewal copyright thereon infringe the copyright on the story if it authorizes the performance of the copyrighted film after the author has died and the copyright on the story has been renewed by a statutory successor under 17 U.S.C. § 24, who has made a new assignment of motion picture and television rights? As has been so often true in cases arising under the Copyright Act of 1909, neither an affirmative nor a negative answer is completely satisfactory. A court must grope to ascertain what would have been the thought of the 1909 Congress on an issue about which it almost certainly never thought at all. *See Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975). In returning an affirmative answer to the question posed, Judge Bauman recognized that the negative would not be illogical, *see* 379 F.Supp. at 727. While we recognize that an affirmative answer likewise is by no means illogical, we believe a negative answer is more in keeping with the letter and purposes of the statute as best we can discern them.

There is no dispute about the facts. Sometime before May 15, 1925, Edith Maude Hull (Mrs. Hull), a British subject, wrote a novel entitled "The Sons of the Sheik." The novel was published in the United States about that time by Small, Maynard & Co., Inc., which obtained a United States copyright, assigned by it to Mrs. Hull in November 1925. By an instrument dated December 7, 1925, Mrs. Hull, as Seller, for a consideration of $21,000, granted, sold and assigned to Joseph H. Moskowitz, as Purchaser, all the motion picture rights to the story for the entire world, "together with the sole and exclusive right to make motion picture versions thereof," to secure copyright on the films, and to "vend, exhibit, exploit and otherwise dispose of the same." The Seller agreed "to renew or procure the renewal of the copyrights" in the story prior to their expiration and thereupon to assign to the Purchaser the motion picture rights for the renewal term.[2]

Pursuant to this agreement, a highly successful silent motion picture entitled "The Son of the Sheik," starring Rudolph Valentino, was produced and released for exhibition in the United States in 1926. On August 24, 1926, the picture was registered in the Copyright Office by and in the name of Feature Productions, Inc., an assignee of Moskowitz. This copyright was renewed on March 18, 1954, in the name of Artcinema Associates, Inc., the then proprietor of the copyright; the renewal copyright was sold in 1961 to Gregstan Enterprises, Inc., a corporation headed by Paul Killiam, and was assigned by Gregstan to the defendant Killiam Shows, Inc. (hereafter Killiam) in 1968.

Mrs. Hull died in 1943. On May 22, 1952, the United States copyright in the novel was renewed in the name of her daughter, Cecil Winstanley Hull (Miss Hull), a party plaintiff herein, the author's sole surviving child. On May 6, 1965, Miss Hull assigned to plaintiff Rohauer all of her "right, title and interest (if any) in and to the motion picture and television rights of every kind and character throughout the world and in all languages" to "Sons of the Sheik." Rohauer paid 446 pounds 10 shillings (then the equivalent of $1250) for this assignment.

On July 13, 1971, the motion picture was shown on television station WNET, owned by defendant Educational Broadcasting Corporation (hereafter Broadcasting) and operating on Channel 13 in the New York metropolitan area. The videotape required for this exhibition was made by Broadcasting from a print of the film made available to it by Killiam. No license had been obtained from plaintiffs Rohauer or Miss Hull, although Rohauer's attorney had informed an officer of Killiam in 1966 of his assignment from Miss Hull and had advised

---

**2.** The appellants concede that because of Mrs. Hull's death before the accrual of the right to a renewal of the United States copyright in the novel, they could not obtain specific enforcement of this agreement in respect of such copyright; they rely on the clause as demonstrating an intention of the parties, which appellees do not dispute, that the Purchaser should be entitled to the motion picture rights both for the original and for any renewal term.

that any showing of the picture would constitute an infringement. Similar notice was given by Rohauer's counsel to Broadcasting the day before the first television showing. After this action was commenced the film was shown twice more on Channel 13.

The plaintiffs claimed and the District Court held, 379 F.Supp. 723 (S.D.N.Y.1974), that upon the expiration of the original term of the copyright in the novel and Miss Hull's succession to the renewal term, all rights of defendants and their predecessors to authorize the exhibition of the motion picture terminated. Defendants-appellants contend that while after the expiration of the original term of the copyright in the novel and the daughter's succession, no new motion picture versions could lawfully be made on the basis of the 1925 grant from Mrs. Hull, their predecessors and they were entitled to renew the copyright on a film already made and copyrighted and to authorize its exhibition.

### I.

In endeavoring to answer the question here posed, we turn first to the words of the statute. Derivative copyright is provided for in 17 U.S.C. § 7, which states in pertinent part:

Compilations or abridgments, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works . . . shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new works shall not affect the force or validity of any subsist-

ing copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.

Section 24 of title 17 begins by stating that "[t]he copyright secured by this title shall endure for twenty-eight years from the date of first publication." An initial proviso states that in several cases there enumerated, including "any work copyrighted . . . by an employer for whom such work is made for hire," the proprietor of the copyright shall be entitled to renewal and extension for a further twenty-eight year term. The problem here arises from a second proviso, stating in pertinent part:

That in the case of any other copyrighted work . . . the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, . . . shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright . . . .

■ The thrust of the portion of § 7 down to the semicolon—and it is a strong thrust—is rather clear.[3] Doubtless aware, even in those simpler days, that new versions of copyrighted works might involve a degree of intellectual effort and expense quite as great as or considerably greater than the contribution of the author of the underlying work, Congress provided that derivative works "shall be regarded *as new works subject to copyright under the provi-*

---

**3.** The 1909 Copyright Act was the first in this country to provide explicit protection for derivative works, although § 5 of the 1891 Act had provided that new "alterations, revisions, and additions" made to books of foreign authors could be copyrighted, 26 Stat. 1108; § 4 of the 1865 Act provided that the "books" subject to copyright under the 1831 Act included "any second or subsequent edition which shall be published with any additions," 13 Stat. 540; and the 1856 Act made explicit the copyright protection of dramatic compositions, 11 Stat.

138, although the right to dramatize an underlying work was not reserved to the author of the work until 1870, 16 Stat. 212. Protection for derivative works was further provided under case law, which considered compilations, digests, and translations as among the works subject to copyright, *see Gray v. Russell,* 10 Fed.Cas. 1035 (No. 5,728) (C.C.D.Mass.1839) (Story, *J.*); *Banks v. McDivitt,* 2 Fed.Cas. 759 (No. 961) (C.C.S.D.N.Y.1875); *Shook v. Rankin,* 21 Fed.Cas. 1335 (No. 12,804) (C.C.N.D.Ill. 1875).

*sions of this title*" (emphasis supplied); plaintiffs-appellees do not dispute that the current proprietor of such a copyright, if the work was originally copyrighted as a work "made for hire", is entitled to effect a renewal of the derivative copyright under § 24. *Shapiro, Bernstein & Co. v. Bryan*, 123 F.2d 697 (2 Cir. 1941); *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213 (2 Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972).

When we look to the second half of the sentence, taking the subjects in reverse order, we find that defendants-appellants are not attempting "to secure or extend copyright" in Mrs. Hull's original work. Likewise they do not assert that Killiam's derivative copyright implies "an exclusive right to such use of the original works"; they concede that any such exclusive right would rest on the agreement of December 7, 1925 and at least implicitly that any such exclusivity, as distinguished from a right of continued use, terminated with the original term of the copyright on the novel. Likewise they do not assert that the publication of the derivative work has any effect on the "validity" of any subsisting copyright. Plaintiffs say, however, that defendants' acts do affect the "force" of Miss Hull's renewal copyright on the novel, since the defendants are invading their exclusive right under § 1 of the Copyright Act to make copies of the work; to "make any other version thereof, if it be a literary work; to dramatize it if it be a nondramatic work"; to make any "transcription or record" of the underlying work from which it might be exhibited or produced in whole or part; and to perform the work in public for profit. Each exhibition of the Valentino film presumably thus constitutes a "dramatization" of the underlying story exclusively reserved to plaintiffs, *see Kalem Company v. Harper Brothers*, 222 U.S. 55, 61, 32 S.Ct. 20, 56 L.Ed. 92 (1911) (Holmes, J.), and an unauthorized "copying" of the underlying story, *see Patterson v. Century Productions, Inc.*, 93 F.2d 489 (2 Cir. 1937),

*cert. denied*, 303 U.S. 655, 58 S.Ct. 759, 82 L.Ed. 1114 (1938). On a parity of reasoning creation of any new prints of the film presumably amounts to manufacturing a new "transcription or record" of the underlying novel, *see Sheldon v. Metro-Goldwyn Pictures Corporation*, 106 F.2d 45, 52 (2 Cir.), *cert. denied*, 308 U.S. 617, 60 S.Ct. 263, 84 L.Ed. 515 (1939), *aff'd*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); *Metro-Goldwyn-Mayer Distributing Corporation v. Bijou Theatre Co.*, 59 F.2d 70, 73 (1 Cir. 1932). In addition, The Authors League of America, Inc. argues in its amicus brief that the "force" of the renewal copyright on an underlying work includes the proprietor's right to "refrain from vending or licensing" and "simply . . . to exclude others from using his property," *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127, 52 S.Ct. 546, 547, 76 L.Ed. 1010 (1932), including preventing any public exhibition for profit of the derivative work.

Defendants answer that sufficient "force" is given to the renewal copyright on the novel if it is held to prevent any new or "second generation" derivative works, without going to the extent of holding that the owner of the derivative copyright may not "print, reprint, publish, copy, and vend the copyrighted work" represented by the derivative copyright, along with others whom the new owner of the underlying copyright may license to make derivative works not infringing the "new matter" added by the owner of the derivative copyright.

■ A legislative history of the 1909 Copyright Act edited and compiled by E. Fulton Brylawski and Abe Goldman which became available only late in 1976,[4] after this appeal had been argued, indicates to us that the "force or validity" clause of § 7 has no bearing on the problem here at issue. In the bills introduced on May 31, 1906, § 7 [then § 6] read as follows:

Sec. 6. That additions to copyrighted works and alterations, revisions, abridg-

---

4. Legislative History of the 1909 Copyright Act (E. Brylawski & A. Goldman, eds.) (Fred B. Rothman & Co. 1976).

ments, dramatizations, translations, compilations, arrangements, or other versions of works, whether copyrighted or in the public domain, shall be regarded as new works subject to copyright under the provisions of this Act; but no such copyright shall affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to grant an exclusive right to such use of the original works.

The clear import of the "but" clause was to protect an author of an original work against two risks thought to be possible as a result of the recognition of derivative copyright. Since the bills as they then stood did not contain the qualification "when produced with the consent of the proprietor of the copyright in such works", it was necessary to provide that derivative copyright should not "be construed to grant an exclusive right to such use of the original works"; such exclusive use would result only from contractual arrangements. The other objective was that nothing done by the proprietor of the derivative copyright should impair the underlying copyright.

Most of the discussion of the derivative copyright section focused on the concern that recognition of derivative copyright might extend the duration of the copyright in the original work. After some discussion whether this did not require a provision that derivative copyright should cease on the expiration of the underlying copyright,[5] the problem was ultimately met by the addition of the final words, "or to secure or extend copyright in such original works."[6]

The change in the language of the "force or validity" clause—from "no such copyright shall affect" to "the publication of any such new works shall not affect"—was due to a comment by Mr. W. B. Hale, representing the American Law Book Company at Joint Hearings before the House and Senate Committees on Patents on March 26, 1908 (Legislative History K78). Addressing himself to the Kittredge bill, *see* note 6, Mr. Hale testified as follows:

*Mr. Hale.* . . .

There is another verbal criticism I should like to make in section 6 of the Kittredge bill, which also relates to compilations, abridgments, etc.

*The Chairman [Senator Smoot].* I think it is the same in the other bills.

*Mr. Hale.* Yes; it is the same in all the bills. I heartily agree with and am in favor of that section; but in line 12, in lieu of the words "but no such copyright shall effect the force or validity," etc., I would prefer to substitute these words: "and the publication of any such new work shall not affect the copyright," etc.

That is to meet this situation. It is the publication of a book without copyright protection that forfeits the copyright, or the publication of a book without proper notice, or anything of that kind. Under the act, as it stands now, it says the copyright shall not affect it. I would like to meet the case of a new compiled work, within the meaning of this clause, that is not copyrighted, or where, by reason of some accident the copyright fails. That should not affect the original copyrights in the works that have entered into and formed a part of this new compiled work. It does not change the intent of the section in any way.

This makes clear,[7] as indeed a close reading of the language of what is now § 7

---

5. *See* Stenographic Report of the Proceedings of the Librarian of Congress' Conference on Copyright, 1st Session, June 1, 1905, *reprinted in* Legislative History, *supra* note 4, at C106–108.

6. The first Kittredge bill, S.8190, introduced on January 29, 1907, included the phrase "when produced with the consent of the proprietor of the copyright in such works" and the final phrase "or to secure or extend," etc. However, the "force or validity" clause still began "but

no such copyright." This pattern was followed by the second Kittredge bill, S.2900, introduced December 18, 1907, and in the other bills introduced prior to March 1908 (H.R. 25133, Rep. Currier, January 29, 1907; H.R. 243, Rep. Currier, December 2, 1907; S.2499, Sen. Smoot, December 16, 1907; H.R. 11794, Rep. Barchfeld, January 6, 1908).

7. The House report accompanying the final version of the 1909 bill, H.R. Rep. No. 2222, 60th

would do alone, that the "force or validity" clause has no bearing on the problem here before us. That is rather how far an author's consent under the first clause of § 7 continues to authorize publication of the copyrighted derivative work during a renewal term of the underlying copyright secured by a statutory successor under § 24.

## II.

Turning to the precedents, we do not find that any of the Supreme Court decisions discussed at length in the briefs, primarily *Fox Film Corporation v. Knowles,* 261 U.S. 326, 43 S.Ct. 365, 67 L.Ed. 680 (1923); *Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943); *De Sylva v. Ballentine,* 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956), and *Miller Music Corp. v. Charles N. Daniels, Inc.,* 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960), has any real bearing on the issue here before us, either in holding or in opinion. All these cases were concerned with the relative rights of persons claiming full assignment or ownership of the renewal term of an underlying copyright. None involved the question here presented of effecting a proper reconciliation between the grant of derivative copyright in § 7 and the final proviso of § 24 with respect to renewals of underlying copyrights.

Appellees contend that even if this be so, the question here at issue has been settled in their favor by lower court decisions, notably *Fitch v. Shubert,* 20 F.Šupp. 314 (S.D. N.Y.1937); *G. Ricordi & Co. v. Paramount Pictures, Inc.,* 189 F.2d 469 (2 Cir.), *cert. denied,* 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); and *Sunset Securities Company v. Coward McCann, Inc.,* 297 P.2d 137 (Dist.Ct. of Appeal 2d Dist.1956), *vacated,* 47 Cal.2d 907, 306 P.2d 777 (1957). Apart from the fact that none of these cases except *Ricordi* would bind us as a precedent, we do not find that any of them decided the question here at issue.

The *Fitch* case involved a dispute between the plaintiff Richard W. Fitch who, as next of kin of the author Clyde Fitch, had obtained a renewal copyright after Clyde Fitch's death on a play called "Barbara Frietchie, The Frederick Girl," and the defendants who had produced a musical version of the play, known as "My Maryland." Clyde Fitch had died intestate without widow or child in 1909, years before the expiration in 1928 of the original term of the copyright in the play. His interest in the initial term passed first to his mother and, after her death, by her bequest to the Actors' Fund of America. In 1925, contemplating the production of an operetta based on "Barbara Frietchie", the Shuberts negotiated a license agreement with the Actors' Fund; the operetta was first produced in 1927, and was leased by the Shuberts for amateur performances over many years thereafter. In 1927 Richard Fitch renewed the copyright on the play and, after the Shuberts had mounted another production, sued them in 1937 for infringement. Although the ultimate holding was that the defendants had acquired a license from the plaintiff by direct dealings with him in the renewal term, Judge Patterson did say, 20 F.Supp. at 315,

> [I]t is clear that the plaintiff acquired a new and independent right in the copyright, free and clear of any rights, interests, or licenses attached to the copyright for the initial term. . . . It is evident therefore that all rights which the defendants acquired in 1925 to use the Fitch play as the basis of a musical operetta expired when the copyright for the original term expired in 1928 and when a new grantee appeared as owner of the Fitch play for the renewal term.

However, this was said in a case where without dispute the original license agreement was limited to the first term; not only did the license agreement make no

Cong., 2d Sess. 10 (accompanying H.R. 28192) noted simply—and incompletely:

Section 6 reenacts existing law and permits the copyrighting of abridgments and new versions of works, or works republished with

new matter, but provides that such copyright shall give no exclusive right to the use of the original works or in any way extend the copyright on such original works.

reference to renewal rights, *Epoch Producing Corporation v. Killiam Shows, Inc.,* 522 F.2d 737, 747 (2 Cir. 1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976), but no one could have meant it to do so. The Shuberts had not obtained the license agreement from an author who could contemplate renewal, but from a charitable grantee after the author's death, when the renewal rights had passed by statute to the next of kin surviving at the end of the original term.

*Ricordi* was a suit by G. Ricordi & Co. for a declaratory judgment against Paramount Pictures, Inc. The case involved the story, play and opera entitled "Madame Butterfly." The novel was written in 1897 by John Luther Long, published that year in Century Magazine and copyrighted by the Century Company. In 1900 David Belasco wrote a play with the consent of the copyright owner which, however, was not copyrighted until 1917. In 1901 Long and Belasco entered into a contract with Ricordi giving it the exclusive right to make a libretto for an opera of Belasco's dramatic version of Madame Butterfly. In 1904 Ricordi copyrighted the famous opera composed by Puccini and subsequently secured an assignment from Puccini's son of the renewal copyright therein. In 1925 Long obtained a renewal of the copyright on his novel and in 1932, subsequent to Long's death, his administrator granted the motion picture rights therein to Paramount. In the same year, with the Belasco play still in its first copyright term, Paramount obtained from the trustee of Belasco's will an assignment of the motion picture rights to the play; no renewal of the copyright in the play was ever effected. Ricordi sought a declaration that it was entitled to make a motion picture of the opera free from any interference by Paramount. This court, speaking through Judge Swan for a particularly distinguished bench including Judge Learned Hand and Judge Frank, held that

Ricordi was not entitled to so broad a declaration. Ricordi's renewal copyright in the opera extended only to so much of the opera as was "a new work." Hence it was not entitled to make general use of the novel for a motion picture version of its opera but was restricted for that purpose to what was copyrightable as new matter in its operatic version.

*Ricordi* is not determinative here, however, for a fundamental reason: the original 1901 agreement between Long, Belasco, and Ricordi did not purport to run beyond the original term of Long's copyright on the novel. Ricordi neither sought nor obtained operatic rights in the renewal term of the novel in the 1901 agreement, or in any other negotiation.[8] To conclude that the renewal term of a copyright is a new estate free from previous licenses is one thing when, as in *Ricordi,* the parties have never bargained for renewal rights, and another when, as in the case of Mrs. Hull and Joseph Moskowitz, the assignment agreement explicitly included rights to the derivative work during the renewal term.

We find even less helpful to the plaintiffs the decisions previously cited in the California case of *Sunset Securities Company v. Coward McCann, Inc.* For whatever it may be worth, the opinion of the District Court of Appeal is favorable to the defendants and the reversal by the California Supreme Court was on grounds of contract rather than of copyright law.

The short of the matter is that we have been cited to no case holding that the inability of an author to carry out his promise to effect a renewal of a copyright because of his death prior to the date for obtaining renewal terminates *as a matter of copyright law* the right of a holder of a derivative copyright to continue to publish a derivative work copyrighted before the author's death on which the copyright was thereafter renewed. It is equally true that

---

**8.** As the *Ricordi* court noted, the 1901 agreement "made no allusion to renewal of copyright." 189 F.2d at 471. It did not even contain more oblique language granting operatic rights "for all time." Though Belasco's play

fell into the public domain in 1945 at the end of its first term, Long did renew the copyright on his novel, and Ricordi conceded it had never sought a new license for operatic rights from Long for the renewal term.

we have been cited no case upholding such a right.

■ With arguments based on the "force or validity" clause of § 7 eliminated by the legislative history, we do not believe, despite language in the cases to the effect that the proprietor of a derivative copyright is "protected" only as to the "new matter" conceived by him and that a statutory successor obtains a "new estate" in the underlying copyright, that the vesting of renewed copyright in the underlying work in a statutory successor deprives the proprietor of the derivative copyright of a right, stemming from the § 7 "consent" of the original proprietor of the underlying work, to use so much of the underlying copyrighted work as already has been embodied in the copyrighted derivative work, as a matter of copyright law. That view is only a slight extension of this court's decision in *Edmonds v. Stern,* 248 F. 897 (2 Cir. 1918). There the purchaser of a song, having copyrighted it with the consent of the composer, prepared an operetta and copyrighted an orchestral medley based on the operetta which utilized, among other things, the notes of the song. Later the purchaser assigned the copyright in the song back to the composer. The court held, as an alternate ground of decision, that the reassignment would not deprive the proprietor of the copyright of the score of the right to sell copies of the medley since, as Judge Hough said, 248 F. at 898,

> The two things [the song and the orchestral score] were legally separate, and independent of each other; it makes no difference that such separate and independent existence might to a certain extent have grown out of plaintiff's consent to the incorporation of his melody in the orchestration. When that consent was given, a right of property sprang into existence, not at all affected by the conveyance of any other right.[9]

So here when the purchaser from Mrs. Hull embodied her story in a motion picture which was copyrighted under § 7, the vesting of the renewal right of the story in her daughter did not affect the property right in the copyrighted derivative work.

The District Court and appellees rely also on the views of the leading text writer, Professor Nimmer, and of commentators to the effect that in circumstances such as those here presented performance of the derivative copyrighted film after the expiration of the original term of the underlying copyright and renewal by a statutory successor constitutes an infringement. The only portion of Nimmer's text which deals specifically with this problem is § 118, entitled "The Effect of a Termination of Rights After the Original Term of Copyright Upon Previously Created Copies." This discussion, which covers both book publishers and motion picture producers, makes no reference to the special problem of derivative copyright and statutory successors. Mr. Bricker's article, "Renewal and Extension of Copyright," 29 S.Cal.L.Rev. 23, 43 (1955), likewise discusses the instant problem only briefly and in a conclusory manner. Barbara A. Ringer, the present Register of Copyrights, in her 1960 study for the Senate Judiciary Committee entitled "Renewal of Copyright" (Study No. 31), *reprinted in* 1 *Studies on Copyright* 503 (Copyright Society of the U.S.A. 1963), is quite tentative on the subject:

> It would seem, on the basis of judicial authority, legislative history, and the opinions of the commentators, that someone cannot avoid his obligations to the owner of a renewal copyright merely because he created and copyrighted a "new version" under a license or assignment which terminated at the end of the first term.

1 *Studies on Copyright* 565–66 (footnotes omitted), *see also id.* at 564. Ms. Ringer does not single out the problem of statutory

---

9. It is true that in stating the facts the court noted that the orchestral arrangement "of course, contained no words." We think that in saying this, the court was simply following the usual and proper judicial practice of deciding

only an easier case that is before it rather than a harder one that is not. To our minds the court's reasoning would cover the sale of a text and score of the operetta as well as of the purely orchestral medley.

succession and continued use in a case where, unlike *Fitch*, a derivative copyright owner has been promised rights to the renewal term by the deceased author.[10] Professor (now Mr. Justice) Benjamin Kaplan, in his Carpentier Lectures, *An Unhurried View of Copyright* 112 (1967), after characterizing the renewal provisions of § 24 as "a goulash," states that the distinction extrapolated from the *Fred Fisher* case, *supra*, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055, as between authors who do or do not survive the original term "may operate in a peculiarly perverse way where on the faith of a transfer from the now-deceased author, the transferee has created a 'derivative work,' say a movie based on the original novel." One can hardly take this as an authoritative pronouncement that the transferee would not even be entitled to exhibit those copies he has already made, still less as meaning that Mr. Justice Kaplan would be opposed to a holding which avoided so "peculiarly perverse" a result. As against these comments, appellants cite an article by Professor Donald Engel, 12 Bulletin of the Copyright Society 83, 119–20 & n. 126 (1964), which concludes:

> The cases indicate that the proprietor of the copyright in an authorized new work who no longer has authorization to use the underlying work may continue to use the new work in substantially identical form but may not create a new version of the new work which also constitutes a new version of the underlying work.

and says of *Ricordi*, correctly in our judgment:

> the "Madame Butterfly" case did *not* hold that the proprietor of the copyright in the new work was precluded from making copies of or permitting public performances of the opera, but merely held that he could not make *general* use of the protected underlying material for the creation of a motion picture, itself a

new work based upon the underlying copyright which he no longer had authorization to use.

*See also* Kupferman, "Renewal of Copyright—Section 23 of the Copyright Act of 1909," 44 Columbia L.Rev. 712, 724 (1944). We thus do not discern any such impressive record of unanimity among the commentators as influenced the Supreme Court in the *Fred Fisher* case, *supra*, 318 U.S. at 658–59 nn. 5–8, 63 S.Ct. 773. Likewise we find little force in the apparent practice of at least some holders of derivative copyrights to obtain consents from identifiable statutory successors. Plaintiffs offered no evidence how widespread the practice is, and when the consent can be obtained cheaply, it is obvious good sense to get it so long as the law remains unsettled.

To such extent as it may be permissible to consider policy considerations, the equities lie preponderantly in favor of the proprietor of the derivative copyright. In contrast to the situation where an assignee or licensee has done nothing more than print, publicize and distribute a copyrighted story or novel, a person who with the consent of the author has created an opera or a motion picture film will often have made contributions literary, musical and economic, as great as or greater than the original author. As pointed out in the Bricker article, *supra*, 29 S.Cal.L.Rev. at 33, the purchaser of derivative rights has no truly effective way to protect himself against the eventuality of the author's death before the renewal period since there is no way of telling who will be the surviving widow, children or next of kin or the executor until that date arrives. To be sure, this problem exists in equal degree with respect to assignments or licenses of underlying copyright, but in such cases there is not the countervailing consideration that large and independently copyrightable contributions will have been made by the transferee. As against this, the

---

**10.** Unlike Ms. Ringer, we do not see any significance for the purposes of this case in the references in the 1906–1908 hearings indicating that derivative copyright protected only so much of a new version as was "new matter." *See, e. g.,* Hearings before the House and Senate Commit-

tees on Patents on S.6330 and H.R. 19853, at 364–65 (December 1906). This was said to answer expressed fears that the grant of derivative copyright might extend the term of copyright in the underlying work. See the discussion in text, *supra*.

author can always protect his heirs by imposing a contractual limit upon the assignment. It is true that this might not be practicable from a business standpoint in cases where the assignment was made shortly before the expiration of the initial term, but those are the very cases where the inequity of terminating the transferee's rights with respect to so much of the underlying work as is embodied in the derivative work is the greatest.

We find recognition of these policy considerations in §§ 203(b)(1) and 304(c)(6)(A) of the recently enacted copyright revision bill, 90 Stat. 2541 (1976). In connection with a new plan whereby copyright in any work created on or after January 1, 1978 or created before that date but not then yet published or copyrighted shall, with certain exceptions, run for the life of the author plus 50 years, with any grant of a transfer or license subject to a right of termination between the 35th and 40th year of the grant; and the renewal term of any existing copyright is extended for another 19 years subject to a right of termination of any transfer or license at the end of the 28th year of the renewal term over a like period of five years, Congress expressly provided:

A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

§§ 203(b)(1), 304(c)(6)(A). While it is true that this proviso was part of a package which extended the temporal rights of authors (but also of their assignees) and that the proviso thus does not deal with the precise situation here presented, we nevertheless regard it as evidence of a belief on the part of Congress of the need for special protection for derivative works.[11] We agree, of course, that provisions of the new Act cannot be read as varying clear provisions of the 1909 Act in cases to which the new Act does not apply. However, the present situation fits rather well under Judge Lumbard's language in *Goodis v. United Artists Television, Inc.*, 425 F.2d 397, 403 (2 Cir. 1970):

Our decision today is that the result which the proposed legislation would compel is not precluded in any way by the decisions rendered under the present Copyright Act. As discussed earlier, the "problem" with which the proposed legislation deals is one which exists because of judicial dicta rendered in cases not apposite to the factual situation before us in this case.

█ For these reasons we hold that the licensing by Killiam of exhibition of the film already copyrighted and its exhibition by Broadcasting did not violate the renewal copyright.[12]

---

11. *See* S.Rep.No.473, 94th Cong., 1st Sess. 111 (1975):

An important limitation on the rights of a copyright owner under a terminated grant is specified in section 203(b)(1). This clause provides that, notwithstanding a termination, a derivative work prepared earlier may "continue to be utilized" under the conditions of the terminated grant; the clause adds, however, that this privilege is not broad enough to permit the preparation of other derivative works. In other words, a film made from a play could continue to be licensed for performance after the motion picture contract had been terminated, but any remake rights covered by the contract would be cut off. *See also* Second Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1975 Revision Bill, October—December 1975, ch. XI, p. 10:

Section 203 is a compromise that attempts to balance the interests of individual authors and their transferees in a fairer way than the present renewal provision.

12. Plaintiffs-appellees contend that even assuming the general correctness of our conclusion, there would be an infringement here since the print licensed by Killiam was used by Broadcasting to create a new videotape for television transmission; plaintiffs contend that this amounts to a "new version" of the original film. Since it was stipulated that such a videotape was necessary for television transmission, we see no reason to consider this tape to be a new version of the film. As appellees admit,

In view of this holding we have no occasion to pass on the various affirmative defenses raised by appellants and rejected by the District Court. There are two principal ones. Plaintiff Rohauer is alleged to come into court with unclean hands since he frequently exhibited the movie prior to 1965 without obtaining a license either from Miss Hull or from the proprietors of the motion picture copyright. The other is a defense of res judicata based upon a judgment of the District Court for the Southern District of Iowa in an action by Rohauer against another licensee of Killiam which the latter defended, where the court dismissed the complaint because of Rohauer's refusal to submit to discovery, *Rohauer v. Eastin-Phelan Corporation*, Civ. 72–25–D (S.D.Iowa, Feb. 7, 1974), *aff'd*, 499 F.2d 120 (8 Cir. 1974). If we were obliged to rule on these defenses, we would regard them as warranting somewhat more consideration than did the district judge.

The judgment is reversed with instructions to dismiss the complaint.

only a few new subtitles were used in the videotape; the newly incorporated music alone, which was certainly not within plaintiffs' copyright, is not sufficient to make it a new work.