216 F.2d 945
 WARNER BROS. PICTURES, Inc., a Corporation, and Alfred A. Knopf, Inc., a Corporation, Appellants,
v.
COLUMBIA BROADCASTING SYSTEM, Inc., a Corporation; William Spier; The Wildroot Company, Inc., a Corporation; Regis Radio Corporation, William Robert Tallman, Giles B. Doud, Joe Eisinger, Batten, Barton, Durstine & Osborn, Inc., and Dashiell Hammett, Appellees.
 No. 13457.
 United States Court of Appeals Ninth Circuit.
 November 9, 1954.
 
 Freston & Files, Ralph E. Lewis, Gordon L. Files, Los Angeles, Cal., for appellants.
 Zissu & Marcus, Leonard Zissu, Abraham Marcus, New York City, Laurence Beilenson, William Berger, Beverly Hills, Cal., for appellee Hammett.
 Crider, Runkle & Tilson, Los Angeles, Cal., for appellee Columbia Broadcasting Co.
 Before STEPHENS and FEE, Circuit Judges, and CLARK, District Judge.
 STEPHENS, Circuit Judge.
 
 
 1
 Dashiell Hammett composed a mystery-detective story entitled "The Maltese Falcon" which was published serially, and each installment was copyrighted by the publisher. Subsequently, Alfred A. Knopf, Inc., entered into a contract with the author to publish the work in book form, Knopf published the book and, in accord with the terms of the contract, copyrighted it.
 
 
 2
 In 1930, after publication in book form and after publication of all installments of the first serial thereof, Knopf and Hammett, designated as "Owners", for a consideration of $8,500.00, granted certain defined rights in and to The Maltese Falcon (called "writings" in the agreement) to Warner Bros., as "Purchaser".[1] Coincidentally, Knopf executed an instrument to Warner called "Assignment of Copyright"[2] for a nominal consideration. The text of the "assignment" shows on its face that it is not an assignment of the copyright but that it is a grant to Warner of specified rights to the use of the writings in The Maltese Falcon. Both the contract between Hammett-Knopf and Warner, and the "assignment" from Knopf, purport to grant to Warner certain defined and detailed exclusive rights to the use of The Maltese Falcon "writings" in moving pictures, radio, and television.
 
 
 3
 By the common law, the author of a writing possesses the sole and exclusive right to publish it, but upon and after the first publication the writing may be published by anyone including the author, since the writing has gone into the public domain. Bobbs-Merrill Co. v. Straus, 1908, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086; Bobbs-Merrill Co. v. Straus, 2 Cir., 1908, 147 F. 15, 15 L.R.A., N.S., 766; Harper & Bros. v. M. A. Donohue & Co., C.C. 1905, 144 F. 491. The copyright statute extends the author's sole and exclusive right in accordance with its terms and provisions. Constitution of the United States, Art. I, § 8, Clause 8; Title 17 U.S.C.A.; Bobbs-Merrill Co. v. Straus, 1908, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086; Bobbs-Merrill Co. v. Straus, 2 Cir., 1908, 147 F. 15, 15 L.R.A.,N.S., 766. In other words, it reserves the writing from the public domain for the effective period of the copyright. What we have just said is what is meant by courts when they say: "When the copyright comes in, the common law right goes out."
 
 
 4
 No question as to the legality of the copyright on The Maltese Falcon or to its continuing effectiveness through all times in suit, or to its complete beneficial ownership by Hammett and Knopf together, is in issue. Therefore, at the effective moment of the grants by Hammett and Knopf to Warner, the latter became possessed of the sole and exclusive right to the writing which is within the copyright, less all limiting terms of the grants. The grants are limited to defined uses in motion picture, talking pictures, radio, and television.
 
 
 5
 It is claimed by Warner that it acquired the exclusive right to the use of the writing, The Maltese Falcon, including the individual characters and their names, together with the title, "The Maltese Falcon", in motion pictures, radio, and television. The use of the title is not in issue, since the grant to Warner specifically includes it.
 
 
 6
 It is the position of Hammett and the other defendants, all of whom claim some interest under him, that the rights acquired by Warner are those specifically mentioned in the conveying or granting instruments, and that the exclusive right to the use of the characters and/or their names were not mentioned as being granted; that the instruments, properly construed, do not convey any exclusive right to the use of characters with or without names, hence Hammett could use them in other stories. However, if, by reason of the silence in the instruments as to such claimed rights, the instruments should be held to be ambiguous on this point, the custom and practice demonstrate that such rights are not customarily parted with by authors, but that characters which are depicted in one detective story together with their names are customarily retained and used in the intricacies of subsequent but different tales.
 
 
 7
 Hammett did so use the characters with their names and did contract with others for such use. In 1946 he used The Maltese Falcon characters including Sam Spade, the detective and the leading character in the Falcon, by name, and granted to third parties the sole and exclusive right, except their use in the Falcon, to use that character by name (later orally enlarged to include other characters of the Falcon) in radio, television, and motion pictures. Under such claimed rights, radio broadcasts of "Adventures of Sam Spade", including "The Kandy Tooth" were broadcast in weekly half-hour episodes from 1946 to 1950.
 
 
 8
 Warner claims infringement of copyright and "unfair use and competition" by such re-use and, as well, for infringement of parts of the story and the whole of the writing inclusive of characters and their names. Hammett and the other defendants deny infringement or unfair use and competition on any count, and Hammett requests the court to declare his rights in the premises. Knopf is a nominal party asking and claiming nothing, and is made a plaintiff under the right granted Warner in the Hammett-Knopf-Warner contract.
 
 
 9
 The trial court denied relief to Warner, declared Hammett's rights, and assessed costs against Warner, who appeals.
 
 
 10
 The instruments under which Warner claims were prepared by Warner Bros. Corporation which is a large, experienced moving picture producer. It would seem proper, therefore, to construe the instruments under the assumption that the claimant knew what it wanted and that in defining the items in the instruments which it desired and intended to take, it included all of the items it was contracting to take.[3] We are of the opinion that since the use of characters and character names are nowhere specifically mentioned in the agreements, but that other items, including the title, "The Maltese Falcon", and their use are specifically mentioned as being granted, that the character rights with the names cannot be held to be within the grants, and that under the doctrine of ejusdem generis, general language cannot be held to include them.[4] As was said in Phillip v. Jerome H. Remick & Co., S.D., N.Y., Op. No. 9,999, 1936, "Such doubt as there is should be resolved in favor of the composer. The clearest language is necessary to divest the author of the fruits of his labor. Such language is lacking here." See, also, Tobani v. Carl Fischer, Inc., 1942, 263 App.Div. 503, 507, 33 N.Y.S.2d 294, 299, affirmed 1942, 289 N.Y. 727, 46 N.E.2d 347.
 
 
 11
 The conclusion that these rights are not within the granting instruments is strongly buttressed by the fact that historically and presently detective fiction writers have and do carry the leading characters with their names and individualisms from one story into succeeding stories. This was the practice of Edgar Allen Poe, Sir Arthur Conan Doyle, and others; and in the last two decades of S. S. Van Dine, Earle Stanley Gardner, and others. The reader's interest thereby snowballs as new "capers" of the familiar characters are related in succeeding tales. If the intention of the contracting parties had been to avoid this practice which was a very valuable one to the author, it is hardly reasonable that it would be left to a general clause following specific grants. Another buttressing fact is that Hammett wrote and caused to be published in 1932, long after the Falcon agreements, three stories in which some of the leading characters of the Falcon were featured, and no objection was voiced by Warner. It is also of some note that the evidence shows that Columbia, long subsequent to the conveying instruments, dickered with Warner for the use of the Falcon on its "Suspense" radio program and, failing in its efforts, substituted "The Kandy Tooth" which uses the Falcon characters under license of Hammett. Warner made no claim against Columbia at or reasonably soon afterward. The conclusion we have come to, as to the intention of the parties, would seem to be in harmony with the fact that the purchase price paid by Warner was $8,500.00, which would seem inadequate compensation for the complete surrender of the characters made famous by the popular reception of the book, The Maltese Falcon; and that the intention of the parties, inclusive of the "Assignment", was not that Hammett should be deprived of using the Falcon characters in subsequently written stories, and that the contract, properly construed, does not deprive Hammett of their use.
 
 
 12
 Up to this point we have discussed the points at issue by construing the contract and by seeking the intention of the parties to it, and we have concluded that the parties never intended by their contract to buy and sell the future use of the personalities in the writing.
 
 
 13
 It will now be profitable to consider whether it was ever intended by the copyright statute that characters with their names should be under its protection.
 
 
 14
 The practice of writers to compose sequels to stories is old, and the copyright statute, though amended several times, has never specifically mentioned the point. It does not appear that it has ever been adjudicated, although it is mentioned in Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F.2d 119. If Congress had intended that the sale of the right to publish a coyprighted story would foreclose the author's use of its characters in subsequent works for the life of the copyright, it would seem Congress would have made specific provision therefor. Authors work for the love of their art no more than other professional people work in other lines of work for the love of it. There is the financial motive as well. The characters of an author's imagination and the art of his descriptive talent, like a painter's or like a person with his penmanship, are always limited and always fall into limited patterns.[5] The restriction argued for is unreasonable, and would effect the very opposite of the statute's purpose which is to encourage the production of the arts.
 
 
 15
 It is our conception of the area covered by the copyright statute that when a study of the two writings is made and it is plain from the study that one of them is not in fact the creation of the putative author, but instead has been copied in substantial part exactly or in transparent re-phrasing to produce essentially the story of the other writing, it infringes.
 
 
 16
 It is conceivable that the character really constitutes the story being told, but if the character is only the chessman in the game of telling the story he is not within the area of the protection afforded by the copyright. The subject is given consideration in the Nichols case, supra, 45 F.2d at page 121 of the citation. At page 122 of 45 F.2d of the same case the court remarks that the line between infringement and non-infringement is indefinite and may seem arbitrary when drawn; nevertheless it must be drawn. Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F.2d 119. See Warner Bros. Pictures v. Majestic Pictures Corp., 2 Cir., 70 F.2d 310, 311.
 
 
 17
 We conclude that even if the Owners assigned their complete rights in the copyright to the Falcon, such assignment did not prevent the author from using the characters used therein, in other stories. The characters were vehicles for the story told, and the vehicles did not go with the sale of the story.
 
 
 18
 We turn to the consideration of general infringement. It is agreed that a story entitled "The Kandy Tooth" is the closest to The Maltese Falcon, and from a practical standpoint if the Tooth does not infringe the Falcon, there has been no infringement.
 
 
 19
 We have set out in notes 7 and 8 at the end of this opinion, short summations of the two works. There is a sameness in the tricks of spinning out the yarn so as to sustain the reader's suspense as to hinted mystery, and there is a similarity in the two stories in that there is a long complicated search for a lost article of fabulous value. The searches are filled with complications, fatalities, and moral delinquencies by characters in name, description, and action of some similarities. The script of the Tooth was not composed by Hammett and, except for a few expressions, is not written in the Hammett literary style.
 
 
 20
 We see no clear error in the trial court's holding that the similarities of the two stories do not go to the degree of constituting practically the same story. There is no textual copying; the mystery of the Tooth and the suspense to the reader would not be dulled through his having read the Falcon. In a phrase, they are different stories though of the same general nature.
 
 Unfair Use and Competition
 
 21
 Warner claims the radio broadcasts, "The Adventures of Sam Spade" and the "Suspense" broadcast of "The Kandy Tooth", and others, wherein the characters of the Falcon were used by name and their peculiarities, constituted unfair use and competition. The trial court found against such contention and we think the conclusion does not constitute clear error.
 
 
 22
 It is patent that the characters of The Maltese Falcon could not fairly be used in such a manner as to cause the Falcon to be materially lessened in its commercial worth by degrading or cheapening them so that the public would not be interested in their capers.[6] They could not be used in such a manner as to deceive the public or to "palm off" to the public the idea that they were really witnessing The Maltese Falcon when they viewed showings of the other stories.[7] We think there was no reversible error in the court's conclusions on these points.
 
 
 23
 Although we have thought it necessary to arrive at some conclusions not entirely in accord with those of the district court, or to arrive at like conclusions through somewhat different reasoning, nevertheless we commend a reading of that court's opinion and notation of authorities cited. We are in complete accord with the order of the district court that the plaintiffs-appellants take nothing, and that defendants-appellees recover their costs.
 
 
 24
 The judgment in accordance with this opinion will settle all of the issues of the case, including all of Hammett's interest in the subject matter under Warner's claims. There is no justiciable controversy between Hammett and Knopf, the nominal plaintiff. It follows that no useful purpose could be served by considering Hammett's prayer for a declaration of his rights and his counterclaim for a declaratory judgment is therefore dismissed and the judgment running to him on it is reversed. Otherwise, the judgment is affirmed.[8],[9]
 
 
 25
 Reversed and affirmed in part. PAGE CONTAINED FOOTNOTES
 
 
 
 Notes:
 
 
 [1]
 The Hammett-Knopf-Warner contract, with certain formalities deleted as in the district court's memorandum decision of December 28, 1951, 102 F.Supp. 141, 143, is as follows:
 "* * * Warner as `Purchaser' was granted the following rights inter alia `in and to that certain story, hereinafter called "writings," entitled "Maltese Falcon" * * *: 1. (a) the exclusive * * * motion picture rights, including, common law and statutory copyright in the same * * * together with all benefits of the copyrights in such writings, the title and the theme thereof, and of all remedies held thereunder, with respect to such motion picture rights; (b) the exclusive right to make motion picture versions thereof * * * including the exclusive right to show * * * photographs in motion, representing scenes or action taken from or based upon said writings, or any adaptation thereof; (c) the exclusive right to record and reproduce language, speech, songs, music, dancing, choreography and other sounds in connection with * * * the production and exhibition of photoplays based upon such writings * * *; (d) the exclusive right for the purpose of such sound records and photoplays, to adapt, use, dramatize, arrange, change, transpose, make musical versions of, add to, interpolate in and subtract from said writings, the language, title and dialogue thereof * * *; (e) the exclusive right to record such writings, language and dialogue and such adaptations, dramatizations, arrangements, change * * * and interpolations on sound records and to reproduce the same from such sound records in synchronism with and/or separately from such photoplays * * *; (f) the right in the writings for production and use upon the spoken stage * * * is reserved to the Owners, but all other now or hereafter existing dramatic, exhibition or other presentation rights in the writings, and without limiting the generality of the foregoing, including talking motion picture rights * * * as well as the right to transmit and exploit scenes and pictures taken or adapted from or based upon said writings, the language, title and dialogue thereof, by radio, television or otherwise, together with the right to transmit and reproduce by radio, television or otherwise, the writings, the language, title and dialogue thereof and the sound records herein referred to in connection with the broadcasting of said motion picture versions * * * are granted exclusively to the Purchaser * * * [and] 12. The Owners warrant and agree that they will not cause or allow or sanction any publication or dramatization of said writings or any arrangement, or revision or reissue thereof in any form in any parts of the world, without first granting to the Purchaser, without further consideration, the silent and talking motion picture rights and the mechanical and recording and reproducing rights (and all the rights set forth in paragraph (1) hereof) and in and to any such arrangement, revision or reissue above named.'"
 
 
 [2]
 "Assignment of Copyright. Whereas, Dashiell Hammett is the author of a certain literary composition entitled "Maltese Falcon", five installments of which have been published * * * and have been copyrighted by Pro-Distributors Corporation; and
 "Whereas, the Pro-Distributors Corporation has heretofore assigned to the Undersigned, Alfred A. Knopf, Inc., the foregoing copyrights, and
 "Whereas, the Undersigned published a novel, "Maltese Falcon" in book form, and registered the novel in United States Copyright Office * * *,
 "Now, Therefore, in consideration of the sum of One Dollar in hand paid and for other valuable considerations now received, the Undersigned sells and assigns unto Warner Bros. Pictures, Inc., its successors and assigns forever, the motion picture and talking motion picture rights * * * in and to the said literary composition (hereinafter called `writings') and all motion picture rights in all copyrights thereof, as well as radio broadcasting and television rights, * * * together with the sole and exclusive right to use, interpolate songs, music, sounds, words and dialogue in, translate, adapt and change said writings and the title in the making of or in conjunction with or separately and apart from motion picture photoplays, and to lease, vend and exhibit the same throughout the world, and to copyright the same in its own name or otherwise, including the right to record and reproduce sounds, language, dialogue and speech taken, adapted and translated from the writings, in connection with and/or in synchronism with and/or separately from the production and exhibition of photoplays based upon such writings, whether such records be on the film itself or on separate discs, or any other material or medium, by means of mechanical, electrical, photographic or other devices and improvements thereupon which are now or hereafter may be used in connection with the production and exhibition of motion pictures (hereinafter referred to as `sound records') and to copyright in its own name or otherwise said sound records.
 "The Undersigned agrees to obtain or cause to be obtained a renewal of such copyrights according to law in order to secure said rights in Warner Bros. Pictures, Inc., during any and all renewal terms, and the Undersigned hereby appoints Warner Bros. Pictures, Inc., its attorney-in-fact with an irrevocable power to do all acts and things for and in the name of the Undersigned to obtain such renewals.
 "Dated: June 23, 1930."
 
 
 [3]
 Taylor v. United States Casualty Co., 269 N.Y. 360, 199 N.E. 620, 115 A.L.R. 822; Evelyn Building Corp. v. City of New York, 257 N.Y. 501, 178 N.E. 771; Tobani v. Carl Fischer, Inc., 1942, 263 App. Div. 503, 33 N.Y.S.2d 294, 299; Hunt v. United Bank & Trust Co., 1930, 210 Cal. 108, 116, 291 P. 184
 
 
 [4]
 Bouvier's Law Dictionary, Baldwins Students Ed., 1934, p. 336; 3 Williston on Contracts, Rev.ed., 1784. See, also, Smith v. McCullough, 1881, 104 U.S. 25, 28, 26 L.Ed. 637; Swift & Co. v. Columbia Ry., Gas & Electric Co., 4 Cir., 1927, 17 F.2d 46, 48, 51 A.L.R. 983; Cleveland Trust Co. v. Consolidated Gas, etc., Co., 4 Cir., 1932, 55 F.2d 211, 215
 
 
 [5]
 "He must be a poor creature that does not often repeat himself. Imagine the author of the excellent piece of advice, `Know thyself', never alluding to that sentiment again during the course of a protracted existence! Why, the truths a man carries about with him are his tools; and do you think a carpenter is bound to use the same plane but once to smooth a knotty board with, or to hang up his hammer after it has driven its first nail? I shall never repeat a conversation, but an idea, often. I shall use the same types when I like, but not commonly the same stereotypes. A thought is often original, though you have uttered it a hundred times. It has come to you over a new route, by a new and express train of associations." The Autocrat of the Breakfast Table, by O. W. Holmes, M.D., p. 9, reprint of original edition
 
 
 [6]
 Manners v. Morosco, 1919, 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590; Harper Bros. v. Klaw, D.C.1916, 232 F. 609
 
 
 [7]
 Stork Restaurant v. Sahati, 9 Cir., 166 F.2d 348; Lone Ranger v. Cox, 4 Cir., 124 F.2d 650
 
 
 [8]
 The Maltese Falcon Story. The theme of the story of The Maltese Falcon is a complicated search for a fabulously valuable bird figurine called The Maltese Falcon. The action of the story centers in San Francisco from elsewhere, with the leading actors, or characters gathering there intent upon the objective. An attractive, alluring woman of uncertain age and reputation, by name Brigid O'Shaughnessy, assuming a false name and great distress, in search of help, called upon private detective Sam Spade, a clever, laconic, rangy-looking man whose morals and practices are none too idyllic, and well if not too favorably known to the police. Brigid qualifies within the requisite of the proverbial monumental liar, but, though Spade is not deceived, she manages to withhold the truth from him. A dunderheaded policeman and his partner enter the tangled story. Effie Perine is Spade's secretary, one of those see-all, know-all, self effacing paragons of loyal efficiency. A mystical character of a man who apparently is cooperating with Brigid against three others of their search-party gets shot to death and Spade is under suspicion. The leader of the search-party is a fat man named Gutman, of infinite patience and possessed of untold money. He proposes to pay a large sum to Sam who represents that he can deliver the bird. An effeminate lackey of a man by the name of Cairo does Gutman's bidding. A young, boyish gunman is under Gutman's orders. The story runs on at accelerated tempo in mystery until the captain of a ship, just in from the Orient, appears at Spade's apartment with a package in hand and falls dead from the boy's bullets sent into him just before he entered Spade's place. All gather at Sam's for the delivery of the bird, supposed to be in the package, and for payment of the money. Sam gets the award and Gutman gets the bird, which is a worthless counterfeit of the genuine. Gutman maintains his sang-froid. Brigid and Sam have trespassed the conventions. Yet, as somehow it is revealed the lady herself was the author of the first fatality, she is delivered over by the benevolent Sam and is sent on her way to San Quentin prison. These characters are skillfully depicted in a running, attractive style and distinctly assume individualism as distinguished from mere other persons
 Warner claims ownership of all of this including the characterizations with the characters' names, and the story.
 
 
 [9]
 The Kandy Tooth Story. The script opens with Sam Spade telephoning from jail to his faithful secretary, Effie Perine, early in the morning. Effie hurries to Sam who dictates his story. Dundy, the police officer, is present. Spade has received a telegram from the fat Caspar Gutman who had been marked "dead" from the end of The Maltese Falcon caper. The telegram is a warning about "an invidious pair of rogues", a dentist, and a charming woman named Hope Laverne, who have something to do with a "hidden tooth". Spade is bailed out by a mystery man who deposits $20,000.00 with the law. Gutman will shortly arrive in San Francisco. The dentist, so Spade dictated, had been ushered into his office by Effie and entreats him to get someone's "bridge". The dentist leaves. Spade contemplates "Hm-m-m * * * Beware the Hidden Tooth". In comes Hope Laverne, a character along the line of Brigid O'Shaughnessy, and she is, or claims to be, a sister of the dentist. Hope explains the brother's obsession about a dental bridge. She wants to find him. Spade goes to a hotel, gets information from a house detective, and finds the brother, badly beaten; the two walk on the street — the dentist collapses. Spade takes him into a newsreel theater. The show excites him — it's about white elephants and particularly Oriental in character. Spade and the dentist go back to Spade's room. There Laverne recites a story of a tooth having been extracted from the jaw of a sacred body long since the occupant of an Oriental tomb. The tooth was taken by international rogues and installed by the dentist in the bridgework of an innocent refugee. The rogues are now attempting to locate the refugee and regain the priceless tooth
 Hope calls Spade on the telephone for help, and he goes, but is attacked by a boy, brother of the gun-boy in The Maltese Falcon. They scuffle and Spade is felled by a gun butt. He comes to in the presence of the imperturbable Gutman and strange happenings ensue. Spade finally gets the tooth in the ashes of the cremated body of the refugee, Herman Julius. $20,000.00 is paid upon delivery of the package containing the ashes. The tooth, by reason of a religious significance, is worth untold wealth to Gutman if he can produce it. A murder is committed; Hope and Sam had been more than friends. A Russian was mixed up in the plot. When Gutman saw that he had been duped through the delivery to him of the cremation residue, he took it as philosophically as when the bird in The Maltese Falcon turned out to be spurious. It develops that $20,000.00 had been put up for Sam's bail, and Sam puts up the same money as bail for Hope who gets into and out of jail. In some not very clear manner it all ends with no money gained by Spade, but Hope telephones her love after leaving jail, and Effie is not sure that the whole affair will net her a new ribbon for her typewriter.