TRUST COMPANY BANK, as Executor of the Last Will of Stephens Mitchell, and as Trustee for Eugene Muse Mitchell and Joseph Reynolds Mitchell, under Trust Instruments dated November 5, 1975, Plaintiffs,

v.

MGM/UA ENTERTAINMENT CO., Defendant.

Civ. A. No. C81–1229A.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 28, 1984.

Melville B. Nimmer, Charles S. Vogel, Sidley & Austin, William T. Rintala, Rintala, Smoot & Jaenicke, Los Angeles, Cal., Gary Hatch, William B.B. Smith, Hansell & Post, Atlanta, Ga., for plaintiffs.

Howard I. Friedman, Michael Brourman, Loeb & Loeb, Los Angeles, Cal., Robert L. Pennington, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for defendant.

## MEMORANDUM OPINION AND ORDER

VINING, District Judge.

This action for declaratory judgment was tried by the court, sitting without a jury,

during September 1983. On May 14, 1984, this court announced its findings of fact and conclusions of law in open court. This memorandum opinion and order will supplement and complement the oral opinion delivered at that time. This memorandum opinion and order constitutes the court's findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

Trust Company Bank is a corporation organized and existing under the laws of the state of Georgia and maintains its principal place of business in Georgia. Trust Company is the trustee for Eugene Muse Mitchell and Joseph Reynolds Mitchell under trust instruments dated November 5, 1975, and is the duly appointed executor of the last will of Stephens Mitchell. Trust Company represents the "Mitchell interests" as that term will be used throughout this opinion.

MGM/UA Entertainment Co. is a corporation organized and existing under the laws of the state of Delaware and maintains its principal place of business in California. MGM/UA is the successor in interest to Metro-Goldwyn-Mayer Film Company.

There is complete diversity of citizenship between the plaintiff and the defendant, and the matter in controversy exceeds the sum of $10,000, exclusive of interest and costs. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

The issue before the Court in this action is who has sequel rights to the novel and motion picture Gone With the Wind.

## I.  History of Applicable Contracts

Prior to August 6, 1935, Margaret Mitchell Marsh wrote an original novel, entitled Gone With the Wind. On or about August 6, 1935, Ms. Mitchell and The Macmillan Company entered into a written agreement for the publication of that book. That agreement provided that Macmillan would print and publish the novel and would pay Ms. Mitchell a royalty on the retail price of each copy sold by Macmillan. The publishing agreement also provided that the dramatic and motion picture rights to the novel were and would remain the property of Ms. Mitchell. On or about July 30, 1936, Ms. Mitchell entered into a written agreement with Selznick International Pictures, Inc. ["SIP"], under which Ms. Mitchell granted motion picture rights to the novel to SIP. In that 1936 agreement Ms. Mitchell conveyed to SIP the exclusive, complete, and entire motion picture rights, including all sound and talking motion picture rights and broadcast rights, throughout the world in and to Gone With the Wind, together with all benefits of the copyright, including common law and statutory copyright with respect to such motion picture and broadcasting rights in the novel and the theme thereof. Ms. Mitchell was paid $50,000, which was the highest price ever paid for the work of a first-time novelist. The picture was successful beyond the dreams of anyone and continues to be one of the most successful motion pictures ever made.

On or about August 25, 1938, SIP and Loew's Incorporated entered into a written agreement under which SIP granted to Loew's the exclusive, sole, and complete control of the distribution, sale, exploitation, marketing, and the disposition or use of the first motion picture based on Gone With the Wind. On or about July 17, 1939, Ms. Mitchell, SIP, and Loew's entered into a written agreement relating to the 1936 agreement between Ms. Mitchell and SIP. The 1939 agreement dealt primarily with what is known in the trade as commercial tie-ups.

On or about August 16, 1949, Ms. Mitchell died leaving a will, under which all rights in Gone With the Wind, not then outstanding, were transferred to her husband, John R. Marsh. On or about May 5, 1952, Mr. Marsh died leaving a will and codicil, under which all rights in the novel, not then outstanding, were transferred to Stephens Mitchell, the brother of Margaret Mitchell Marsh.

In 1957, Mr. Mitchell entered into a contract with David O. Selznick relating to the development and production of a play based upon Gone With the Wind. Para-

graph 13 of that agreement provides in relevant part, "It is expressly understood that no right of sequelization is granted by the Owner." In May 1963, MGM entered into an agreement with Stephens Mitchell and his two sons, Eugene M. Mitchell and Joseph R. Mitchell, which agreement was primarily designed to deal with the issue of rights in Gone With the Wind during the copyright renewal period. In this opinion this agreement, which was dated as of December 4, 1961, will be referred to as the "1961 agreement."

## II. The 1936 Agreement

■ The 1936 agreement between Ms. Mitchell and SIP did not grant sequal rights to SIP; in fact, the contract is silent as to sequel rights. Consequently, the court considered evidence outside the contract in determining whether the parties intended to grant sequel rights. It is apparent to the court that Mr. Selznick did not think that he had sequel rights and that Ms. Mitchell clearly did not intend to grant sequel rights. This conclusion is based upon numerous memoranda and letters authored by Mr. Selznick, Ms. Mitchell, and persons acting on their behalf.

On February 2, 1938, even before the movie had gone into full production, David Selznick understood and recognized the value of a sequel, and he wrote a memorandum to Ms. Katharine Brown, who at that time was SIP's eastern representative, asking that she begin trying to acquire sequel rights to Gone With the Wind. The memorandum from Mr. Selznick to Ms. Brown reads in part as follows:

I wonder if you couldn't start the wheels going toward a *Gone With the Wind* sequel with an agreement on our part to pay a substantial price.

Inevitably a sequel to this story will be very valuable, both from publication and picture standpoints, and while I feel it practically certain that if and and when Miss Mitchell should write such a sequel she would offer it to us, I feel that perhaps we could stir her into writing one partially through making it clear how much money she could make out of

such a sequel through what we would agree to pay, and what book publishers, magazines, and newspaper syndicates would agree to pay, which I think might cause her to get busy on such a sequel.

. . . .

If all else failed, and as a considerably less desirable alternative, perhaps she would sell us the future exclusive radio, television, and picture rights to the characters of Rhett and Scarlet, which would permit us to do our own sequel, or sequels, just as M.G.M. has done and are [*sic*] doing with THE THIN MAN series.

On February 5, Ms. Brown responded to Mr. Selznick's memorandum, stating that she would try to get the sequel rights from Ms. Mitchell but cautioning that she would prefer to hold off on any such conference until the actual production of Gone With the Wind had started.

On January 9, 1940, Mr. Selznick sent a memorandum to Ms. Brown and Mr. J.H. Whitney, chairman of the board of SIP, in which he stated in relevant part:

The more I think of it, the more I feel that you two have some sort of insane artistic streak that is slightly contradictory, to say the least, in view of your hammering on the sordid financial aspects of our operations for so long. I was under the impression that I was the artist, and you were the business men; but I have drawn no conclusion but the reverse each time I think about your fantastic attitude about the sequel.

I assure you we can make more money than we can out of making two or three "REBECCA's" simply by selling the sequel rights together with Miss Leigh, if we are foolish enough not to make the pictures ourselves.

I think we ought to get busy on this, and without any more nonsense about what an awful thing it would be to do. TO WHOM IS WHAT I WANT TO KNOW? The public wants it, the exhibitors want it, MGM wants it, and I want it, and what are you three (the two of you and Miss Mitchell) against so many? I think we should try to buy all sequel

rights from her so that we can go on making sequels forevers, in the manner of "The Thin Man," if that should prove, as I suspect it would, to be a more profitable endeavor than making all the other pictures we can think of combined....

In dealing for the sequel rights, we might be able to buy them in the singular as "sequel rights"—with it being up to us to decide whether there is to be one sequel or more. Or, if you insist, we could buy the rights to just one sequel with successive options for another eight or ten of them, with payments of so much per sequel.

On February 1, 1940, Mr. Selznick again sent a memorandum to Ms. Brown, in which he stated in part:

There is only one thing I want to get out of the Marshes, and that is to buy sequel rights from them.... Whether or not we ourselves ever make the dequel [*sic*], there is a fortune to be made on a deal under which Metro would make the picture, if we didn't want to make it ourselves. And there is literally nothing in our projected future comparably important from a financial standpoint with the securing of these sequel rights.

On April 26, 1940, John R. Marsh wrote a letter to Daniel T. O'Shea, assistant to the president of SIP, regarding a so-called sequel which had been brought to Mr. O'Shea's attention. In his letter Mr. Marsh stated:

You may be certain that we will take steps to prevent any sale or use of this purported sequel, for Mrs. Marsh does not intend to have her sequel rights infringed upon in any way. Of course, the rights are worth a lot of money to her, but, beyond that, she feels a personal interest in Scarlet, Rhett, and the other characters she created and she would fight to defend them from misuse and abuse by some other writer.

On June 8, 1940, Ms. Brown wrote Ms. Mitchell a letter wherein she stated:

David would like to purchase from you the sequel rights.... He therefore asked me to ask you two questions: 1., if you would write a sequel to "GONE WITH THE WIND" in book form, or in narrative motion picture form (the latter would mean an outline with as much or as little dialogue as you prefer); 2., if you yourself would not care to write a sequel, would you sell to us the right to create a sequel ourselves.

In a lengthy letter dated June 14, 1940, in which Ms. Mitchell details the reasons for her response, she succinctly states:

About the sequel rights, your inquiry was not unexpected, as there have been so many stories in the newspapers about proposed or possible sequels to the movie. I appreciate the frankness with which you discuss the situation and I will answer in the same manner, as follows: 1. I have no plans at this time for writing a sequel to "Gone With the Wind"; 2. I would not consider selling the right to create a sequel, to Mr. Selznick or anybody else.

Ms. Brown sent a copy of that letter to Mr. Selznick, and on June 22, 1940, Mr. Selznick wrote Ms. Brown, "I suppose this ends the sequel."

However, Mr. Selznick again sent memos to Ms. Brown on June 27, 1941, and on September 29, 1941, asking her to see about getting a sequel or sequel rights from Ms. Mitchell. On October 1, 1941, Ms. Brown responded to Mr. Selznick by informing him that she had talked with Ms. Mitchell and that Ms. Mitchell said that she would not do a sequel and that she would not sell to SIP the rights to the characters.

Carol Brandt, of Metro-Goldwyn-Mayer wrote Ms. Mitchell on December 4, 1945, and again on January 25, 1946, encouraging her to do a sequel. Ms. Mitchell declined. Ms. Brandt then attempted to encourage Harold Latham of The Macmillan Company to use his influence to obtain a sequel from Ms. Mitchell. On September 12, 1947, Ms. Mitchell wrote to Mr. Latham and stated, "If you will just tell the lady 'no,' I'll be very grateful and it will save me from having to write another letter—or probably six or seven letters if I may judge by my experience with movie people."

It is evident to this court that Ms. Mitchell did not intend to convey sequel rights to SIP in the 1936 agreement and it is also clear that SIP, through its president, David O. Selznick, did not believe that it had acquired sequel rights to Gone With the Wind. Buttressing this court's conclusion that Mr. Selznick did not believe that he had acquired sequel rights in the 1936 agreement, it is this court's firm belief that Mr. Selznick was the type of businessman who, if he believed that he had acquired any sequel rights, would certainly have proceeded to produce and market a sequel.

This court previously granted a motion for partial summary judgment, declaring that no sequel rights were conveyed by Ms. Mitchell to SIP by the 1936 agreement. The defendant has moved to reconsider that motion, but the court for the reasons stated above sees no reason to deviate from that prior ruling. Consequently, the defendant's motion to reconsider is DENIED.

### III. The 1939 Agreement

The 1939 agreement supplemented the 1936 agreement and dealt primarily with commercial tie-ups. However, there is one provision in that contract which is particularly significant to this litigation. Paragraph I(b) provides in pertinent part as follows:

> Nothing in this grant of commercial tie-up rights shall be deemed to convey to the purchasers [i.e. SIP and Loew's] any literary rights in the said novel or its characters or their names. The Purchasers shall not have the right to prepare or to· authorize the preparation of any sequel to the said novel or any condensation or adaptation or new version of it of any kind or to describe or picture the characters in new situations, scenes or adventures and/or to publish the same in serials or comic strips or by caricatures or in any other manner.

### IV. The 1961 Agreement

■ The 1961 agreement between Stephens Mitchell, Eugene M. Mitchell, and Joseph R. Mitchell and Metro-Goldwyn-Mayer came about because of Ms. Mitchell's death in 1949 and the death of her husband, John R. Marsh, in 1952, resulting in Stephens Mitchell's becoming the owner of all rights to Gone With the Wind previously held by Ms. Mitchell and Mr. Marsh.

Although Ms. Mitchell in the 1936 agreement had agreed to renew the copyright to Gone With the Wind prior to the expiration of that copyright, when she died, her estate was relieved of that contractual obligation, since an assignment by an author of his renewal rights made before the original copyright expires is ineffective if the author is not alive at the commencement of the renewal period. *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 375, 80 S.Ct. 792, 794, 4 L.Ed.2d 804 (1960). Since Ms. Mitchell died in 1949 and the renewal expectancy did not vest until 1963, it is clear that the purported grant of rights during the renewal copyright period under the 1936 agreement was of no effect. Consequently, it was necessary for MGM, as the successor in interest to SIP, to obtain a grant of renewal rights from Stephens Mitchell, in whom such rights were vested in the early 1960's.

There are two major factors which were very important in the contract negotiations between MGM and Stephens Mitchell. First, by that time Gone With the Wind had established itself as the most successful motion picture in the history of the industry. In fact, the evidence presented shows that even as of the date of the trial of this case, Gone With the Wind was recognized as the most valuable property of MGM. Second, MGM had to enter into a contract with Stephens Mitchell or lose its rights to Gone With the Wind in 1963, when the copyright expired and when Stephens Mitchell would have been free to contract with anyone else regarding rights to Gone With the Wind.

For the above reasons Stephens Mitchell undeniably had by far the stronger bargaining position. Of course, Mr. Mitchell undoubtedly understood that it was preferable to negotiate with MGM because of its prior relationship with Gone With the Wind

and because MGM probably had more money to offer than anyone else. From the evidence presented at trial and from the 1961 agreement itself, it is evident that there was one thread that ran throughout the negotiations and that was Stephens Mitchell's intent on protecting Gone With the Wind. It is equally clear that Stephens Mitchell felt that the primary way to protect the property was not to allow the grant of any type of sequel right.

It is not seriously disputed that Mr. Mitchell took the position during these negotiations that the most important prerequisite for for the contract's consummation was insuring that there would be no sequel rights granted. Although numerous changes were made in the contract, as would be normal with any contract of that length, one thing remained firm—there would be no sequel.

The 1961 agreement does not mention sequel rights as such. What is found in that contract, however, is simply the grant of "[a]ll the same rights under renewal copyright as were granted to SIP under the Original Motion Picture Grant Agreement", the 1936 agreement, except for certain exceptions not relevant to this lawsuit. Since the court has previously held and has reaffirmed in this order that no sequel rights were granted by the 1936 agreement, the defendant did not receive any sequel rights by virtue of the 1961 agreement.

The defendant insists that the language contained in paragraph 7(a)(i)(2) of the 1961 agreement was intended to expressly grant to the defendant the right to produce sequels subject only to the restriction on the time period of any new story. The relevant paragraph reads as follows:

> Metro shall have no right to produce any motion picture or other production with the plot or the story or the characters of the Novel, in which the lives of the characters therein shall be carried beyond the time of the ending of the Novel.

The court does not believe that this restriction in any way gives the defendant the right to make sequels. This finding is especially so since paragraph 9 of the 1961 agreement specifically states: "All rights not herein sold or agreed to be sold to Metro are reserved for use to Owner, as their respective interests appear." This court is unwilling to hold that an express restriction prohibiting sequels in which the lives of the characters are carried beyond the time of the ending of the novel is a grant of sequel rights for other time periods. (Although the denotative meaning of "sequel" means a literary work continuing the course of a narrative begun in a preceding one, "sequel" as used in the movie industry means only a work that follows another, regardless of whether the successive work is set prior to, during, or after the time period of the first work.)

The seminal case of *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2d 945 (9th Cir.1954), is instructive on the question of whether a general grant of motion picture rights implicitly carries with it a grant of sequel rights. In that case, commonly known as the Sam Spade case, the court considered whether the author of *The Maltese Falcon* in granting to Warner Brothers the exclusive right to the use of the writing *The Maltese Falcon* included with it the exclusive right to the use of the characters and/or their names also. Initially, the court noted that writers traditionally composed subsequent stories using characters introduced and developed in previous stories and that the copyright statute, though amended several times, had never addressed this matter. Additionally, the court stated, "If Congress had intended that the sale of the right to publish a copyrighted story would foreclose the author's use of its characters in subsequent works for the life of the copyright, it would seem Congress would have made specific provision therefor." 216 F.2d at 950. The court also stated, "The characters were vehicles for the story told, and the vehicles did not go with the sale of the story." 216 F.2d at 950. For these reasons, the Ninth Circuit held that the grant of the use of a

copyrighted work did not carry with it a right to make sequels of the work.

In the Sam Spade case, the Ninth Circuit not only considered whether there was a statutory basis in the copyright law for an implicit grant of sequel rights but also considered the contract between Warner Brothers and Dashiell Hammett, the author of *The Maltese Falcon,* and looked to see whether there was a contractual grant of sequel rights from Mr. Hammett to Warner Brothers. After considering the contract, the court held:

> We are of the opinion that since the use of characters and character names are [*sic*] nowhere specifically mentioned in the agreements, but that other items, including the title, "The Maltese Falcon", and their use are specifically mentioned as being granted, that the character rights with the names cannot be held to be within the grants, and that under the doctrine of *ejusdem generis,* general language cannot be held to include them. 216 F.2d at 949 (footnote omitted).

The court went on to note that the clearest language is necessary to divest an author of the fruits of his labor and found that such language was lacking in the agreements before it.

*Goodis v. United Artists Television, Inc.,* 425 F.2d 397 (2d Cir.1970), does not require a contrary result. That case simply held that with respect to whether the author of the novel *Dark Passage* had conveyed to Warner Brothers the right to make and broadcast a television series entitled "The Fugitive" based upon that novel, there was sufficient issues of material fact to preclude a grant of summary judgment. Although the *Goodis* court made passing reference to the Sam Spade case, it neither adopted nor rejected the reasoning in that case, for it was unnecessary to do so. *Goodis* simply held with respect to sequel rights that the trial court should have heard evidence instead of granting a motion for summary judgment.

■ It is a general rule of contract construction that an ambiguous contract is construed against the person drafting it. However, that rule of construction is not applicable in this case because it is obvious that the 1961 contract was the product of a joint effort. It is equally apparent after reading all of the documents that both MGM and the Mitchell interests were represented by very able counsel in the negotiations leading to the 1961 agreement. Consequently, the particular language of the contract cannot be construed against either party simply because one party and not the other was responsible for that particular language.

There are two other facts which militate against MGM's position that it was granted sequel rights in that agreement. First, MGM was fully aware both of the *Sam Spade* decision and of all the commentary that had followed that decision. After the *Sam Spade* decision, MGM could no longer rely upon an implicit grant of sequel rights in an agreement conveying motion picture rights to it. Additionally, prior to the signing of the 1961 contract Ms. Katharine Brown, who at this time was a literary agent representing the Mitchell interests, made clear to MGM that the most important feature of the 1961 contract would be that Mr. Mitchell would not grant sequel rights to anyone.

The second matter militating against MGM's position is the testimony of Benjamin Melniker, who in 1961 was a member of the legal department of MGM and who participated in the negotiations leading to the 1961 agreement on behalf of MGM. Mr. Melnicker testified that MGM was not sure about its legal position with respect to whether it had previously obtained sequel rights to Gone With the Wind but that MGM's primary objective in the negotiations leading to the 1961 agreement was to obtain the right to continue showing Gone With the Wind because it was MGM's most valuable property. He further testified that it could have been in his mind that the best thing to do was simply leave the question of sequels alone and proceed to get the right to continue showing Gone With the Wind.

For the foregoing reasons, this court concludes that there is nothing in the 1961 agreement that conveyed sequel rights from the Mitchell interests to MGM and that there is nothing in evidence to support a finding that the Mitchell interests intended to convey such sequel rights to MGM.

## IV. The 1975 Contracts

In 1975 Stephens Mitchell apparently abandoned his longstanding opposition to the production of any sequel. Ms. Brown, on behalf of the Mitchell interests, notified Marvin Josephson, the president of the agency where she was employed, that Mr. Mitchell had abandoned his opposition and would be willing to allow a sequel if appropriate financial consideration could be arranged. Mr. Josephson contacted Richard Zanuck and David Brown, who expressed considerable interest in producing the contemplated sequel. Shortly thereafter, Mr. Josephson arranged a meeting with Sidney Sheinberg, the president of Universal Pictures and offered the project to Universal. When Universal expressed interest in the deal, negotiations were quickly commenced.

After learning of this development, MGM let it be known that it would attempt to stop the making of the sequel. Consequently, it became necessary for the Mitchell interests, Universal, and MGM to participate in the negotiations. The defendant argues that the subsequent negotiations reflect the acknowledgement by all of the parties to those negotiations, including the Mitchell interests, that MGM had sequel rights to Gone With the Wind. However, the evidence presented at trial convinces this court that the Mitchell interests never conceded during those negotiations that MGM did have sequel rights; rather, they insisted that MGM be a party to those negotiations so as to preclude even the possibility of a lawsuit by MGM contesting whether the Mitchell interests had the right to grant sequel rights to Universal. Inviting MGM to participate in the negotiations was simply a way to avoid a lawsuit, not an acknowledgement that MGM did, in fact, have sequel rights.

Although the parties eventually signed contracts which granted Universal a three-year option (with the right to extend the period for one additional year) to develop a sequel, no sequel was ever produced. This failure was the result of the provision in the contract between MGM and Universal that the sequel would be produced "if such screenplay is approved by the parties and the parties are in agreement on creative and business elements involved in the production." The screenplay that was eventually created was not acceptable to MGM, and no sequel was developed.

The defendant also argues that if this court should determine that the Mitchell interests, and not MGM, own the sequel rights, the Mitchell interests should be prohibited from granting those sequel rights to any other party. This contention is based upon paragraph 2(g) of the 1936 agreement, which provides in relevant part as follows:

> The Owner will not exercise any of the rights in the Property not herein granted to the Purchaser, in a manner to compete with or impair the value of the rights herein granted the Purchaser and/or any photoplay based on the Property. No dramatization other than full length first class legitimate production of the Property, nor any part thereof ... shall be presented in vaudeville, or produced, presented or otherwise performed at any theatre in which motion pictures (sound and/or silent) are exhibited, at her instance or by her consent or with her sanction.

The defendant argues that a sequel to Gone With the Wind will damage their property and, therefore, the plaintiff should be prevented from developing or authorizing the development of a sequel.

The evidence in this case is insufficient for the court to find that a sequel would compete with or impair the value of the rights granted to the defendant in the 1936 agreement. Two witnesses testified at trial with respect to the possible effects of a sequel on Gone With the Wind. James R. Velde, who is currently a consultant to

producer Ray Stark and to Columbia Pictures, began working in the motion picture industry in 1937. From 1947 to 1951 he worked with Selznick Releasing Organization, Inc., and from 1951 until his retirement in 1977 he worked with United Artists. Mr. Velde testified on behalf of the defendant and stated that a first rate production with first rate actors would destroy the value of the original, primarily because it would destroy the film rental value of the original. David Brown is a well-known producer whose productions include such movies as The Sting, Jaws, Jaws II, and The Verdict. He was involved, with Richard Zanuck, in the attempt to produce a sequel for Universal pursuant to the 1975 contracts discussed earlier. Mr. Brown testified for the plaintiff, stating that a sequel would have no effect on Gone With the Wind, since that movie is a classic, which stands by itself. He testified that a bad sequel would have a short run and would soon be forgotten and that a good sequel could raise audience interest in the original Gone With the Wind.

Based upon the evidence presented, this court finds that MGM has not carried its burden to show that a sequel would damage its rights in Gone With the Wind. Any possible damage (or enhancement) caused by a sequel would be pure speculation.

For the foregoing reasons, this court holds that all sequel rights, both domestic and world-wide, remain the property of the plaintiff and that the plaintiff may dispose of those rights as it chooses. The clerk will enter judgment for the plaintiff declaring that the plaintiff is vested with all sequel rights to Gone With the Wind and further declaring that it may dispose of those rights as it chooses.